UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:_____

PETER HALMOS, INTERNATIONAL
YACHTING CHARTER SERVICES, and
HIGH PLAINS CAPITAL CORPORATION,

       Plaintiffs,

vs.

RICHARD W. SPINARD, in his official capacity as
Under Secretary of Commerce for Oceans and Atmosphere
and Administrator of the National Oceanic and Atmospheric
Administration, NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION, GINA M. RAIMONDO, in her
official capacity as Secretary of the United States Department
of Commerce, UNITED STATES DEPARTMENT OF COMMERCE,
SHAWN HAMILTON, in his official capacity as Secretary of the Florida
Department of Environmental Protection, FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION, ERIC SUTTON, in his official
capacity as Executive Director of the Florida Fish and Wildlife
Conservation Commission, FLORIDA DEPARTMENT
OF ENVIRONMENTAL PROTECTION, SHAWN HAMILTON,
in his official capacity as Director of the Florida Department
of Environmental Protection, THOMAS REINERT, in his official
capacity as Regional Director for the Southern Region of
the Florida Fish and Wildlife Conservation Commission, RODNEY
BARRETO, ROBERT A. SPOTTSWOOD, STEVEN HUDSON,
GARY NICKLAUS, GARY LESTER, SONYA ROOD,
and MICHAEL W. SOLE, in their official capacity as Commissioners
of the Florida Fish and Wildlife Conservation Commission,
and FLORIDA FISH AND WILDLIFE CONSERVATION
COMMISSION,

       Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

     Peter Halmos, International Yachting Charter Services, and High Plains Capital

Corporation file this complaint against Richard W. Spinard, the National Oceanic and Atmospheric

Administration ("NOAA"), Gina M. Raimondo, the United States Department of Commerce, Shawn Hamilton, the Florida Department of Environmental Protection, Eric Sutton, Thomas Reinert, Rodney Barreto, Robert A. Spottswood, Steven Hudson, Gary Nicklaus, Gary Lester, Sonya Rood, Michael W. Sole, and the Florida Fish and Wildlife Conservation Commission ("FWC"), and in support state:

## INTRODUCTION

1.   In the early morning hours of October 24, 2005, Hurricane Wilma struck the Florida Keys with a never-before recorded fury.  Peter Halmos was aboard his sailing yacht, *S/Y Legacy* - a 158-foot Perini Navy Ketch designed and built for circumnavigation – along with her captain and full crew – when the storm struck.  A careful man, Halmos had taken due care to ensure that *Legacy* and her crew would safely ride out the storm.  Despite his best efforts, however, *Legacy* suffered catastrophic damage.

2.   Halmos recalls waking up when *Legacy* suddenly lurched.  He got up to inspect. As Halmos climbed towards the top deck, a second lurch threw him off balance.  Halmos tumbled down the stairs.  When he finally made it topside, Halmos initially thought that *Legacy* had broken free of her anchors.  *Legacy's* captain and crew tried to reattach her anchors within the main Key West channel, only to discovery that the anchors had separated in two because of latent manufacturer defects.  Calls to the Coast Guard yielded little more than a promise to notify the crew's next of kin.  Fear swept over *Legacy's* crew.  Hurricane Wilma's powerful winds ripped off *Legacy's* twin masts.  Tens of thousands of pounds of aluminum crashed onto the vessel's wheelhouse and hull.  Seawater invaded the ship, coming through the damaged air vents and into her galley.  The crew rushed to stuff bed linens into the vents but could not completely stop the water intrusion.  Sparks flew as sea water fried *Legacy's* electronics.  *Legacy's* captain shut down

all power to the vessel and called his wife to say goodbye.  Halmos and his crew gathered in *Legacy's* salon holding hands in the dark.

3.    Being sucked into the Gulf at about 10 knots and with no ability to control *Legacy,* Halmos and his crew were at the mercy of Mother Nature.  They had one hope – to run aground before being swept into Hurricane Wilma's eye. After what seemed like an eternity, that is exactly what happened.  *Legacy's* hull remained intact and the crew's lives were spared.

4.    Halmos, however, would soon find himself in the middle of another equally uncontrolled and fiercely dangerous storm.  This time he would not be fighting against Mother Nature.  Instead, Halmos was victimized by a veritable alphabet soup of predatory government agencies.  Although Halmos and his crew were lucky to run aground, they could not have landed in a worse spot.  After being battered by Hurricane Wilma for hours, *Legacy* eventually came to rest within the government-controlled Great White Heron National Wildlife Refuge which lies within the Florida Keys National Marine Sanctuary.  This is a protected area spanning thousands of acres between the Dry Tortugas in the Florida Keys and Miami's Biscayne Bay.

5.    Led by the National Oceanic and Atmospheric Administration ("NOAA"), the federal and state government would not let Halmos rescue *Legacy* without going through a legally complex and protracted permitting process that required Halmos to forfeit important rights.  For more than a year, Halmos fought to get the necessary permits.  Permits in hand, he then struggled to find a salvor who could do the work.  All the while, NOAA hovered over Halmos, threatening investigations, administrative actions, and fines in the tens of millions of dollars.

6.    For two years, the government continued to victimize Halmos, but he would not back

down.  Eventually, NOAA came to its senses, although not before inflicting considerable damage upon Halmos and *Legacy*.  In 2007, Halmos and his related entities entered into separate written agreements with NOAA and its agent and partner, the State of Florida.

7.  Both agreements are notable for the broad language used and agreed to by NOAA and its agent and partner, the State of Florida.  The Agreements resolved all claims among and between Halmos and his related entities on the one side and NOAA and the State of Florida on the other.  Through these Agreements, all involved agreed that they were **"FOREVER BUYING THEIR PEACE."**  But the Agreements went well beyond a standard settlement agreement.  To resolve the claims by Halmos and his related entities because of the government's wrongdoing, NOAA and the State of Florida agreed to several significant undertakings.

8.  NOAA and the State of Florida promised not sue Halmos or his companies for any claims relating to or arising from any purported damage to the Sanctuary caused by *Legacy* during and after Hurricane Wilma.  They agreed not to encourage any others to sue or otherwise interfere with Halmos and his companies in similar matters.  More importantly, NOAA and the State of Florida agreed that they would help Halmos and his companies should they be sued or wish to sue in connection with any matters directly or indirectly arising from or relating to the subject-matter of the Agreements.   Likewise, the government agreed not to aid any others directly or indirectly in actions against Halmos and/or IYC.  These promises were at the heart of the settlement agreements at issue here.

9.  Despite these promises, Halmos continued to be victimized with no hope of peace.  For more than a decade, Halmos has endured a number of investigations by regulatory and law enforcement agencies; he has been sued by private parties in matters relating directly to the damage suffered by *Legacy* during Hurricane Wilma; and he has even come close to death on several

occasions, most recently having suffered a traumatic brain injury as he looked for a new home for *Legacy* after it was evicted from its temporary dock in Key West, Florida.  Throughout these years, NOAA and the State of Florida have not only failed to honor the terms of the 2007 Agreements, but they have also continued to victimize Halmos and his related entities by denying the aid and support promised under the Agreements.

10. This lawsuit now seeks enforcement of the 2007 agreements between Halmos, IYC, NOAA, and the State of Florida.

## THE PARTIES

11. Plaintiff Peter Halmos is a resident of Palm Beach County, Florida.

12. Plaintiff International Yachting Charter Services owns the *S/Y Legacy*, a 158-foot sailboat.  In 2005, *Legacy* suffered catastrophic damage as Hurricane Wilma battered the Florida Keys.

13. Plaintiff High Plains Capital Corporation is the registered owner of *M/V Mongoose*, a 46-foot power boat that serves as a tender for *S/Y Legacy*.

14. Defendant Richard W. Spinard is Under Secretary of the United States Department of Commerce for Oceans and Atmosphere and is the Administrator of the National Oceanic and Atmospheric Administration and is being sued in that official capacity.  Secretary Spinard is responsible "for the strategic direction and oversight of the agency and its over 12,000 employees, including developing NOAA's portfolio of products and services . . . ."[1]

15. Defendant National Oceanic and Atmospheric Administration exists to "better understand our natural world and help protect its precious resources . . . ."[2]  As further alleged below, NOAA owes Plaintiffs a number of contractual duties.

---

[1]    https://www.noaa.gov/our-people/leadership/richard-w-spinrad-phd (last visited October 12, 2021).
[2]    https://www.noaa.gov/about-our-agency (last visited October 15, 2021).

16. Defendant Gina M. Raimondo is the United States Secretary of Commerce and is being sued in that official capacity.  The Department's mission "is to create the conditions for economic growth and opportunity."[3]  To accomplish its mission, the Department works through several specialized Bureaus.[4]  NOAA is a Bureau within the Department of Commerce.[5]

17. Defendant Shawn Hamilton is Secretary of the Florida Department of Environmental Protection.  In his official capacity, Secretary Hamilton oversees the operations of the Florida Department of Environmental Protection ("FDEP").

18. Defendant Florida Department of Environmental Protection is the state's "lead agency for environmental management and stewardship, protecting [Florida's] air, water, and land."[6] Together, FDEP and NOAA manage the Florida Keys National Marine Sanctuary.[7]

19. Defendant Eric Sutton is the Executive Director of the Florida Fish and Wildlife Conservation Commission ("FWC") and is being sued in that official capacity.  Director Sutton is charged with aiding the seven-member commission comprising the governing board of the FWC by providing "day-to-day administrative leadership" as well as "supervising, directing, coordinating, and administering all necessary activities for the FWC."[8]

20. Defendant Thomas Reinert is the Regional Director for the Southern Region of the FWC and is being sued in that official capacity.  Director Reinert "is in charge of administrative services and project management" within FWC's Southern Region which includes Monroe County, Florida.[9]

21. Defendant Rodney Barreto is one of the FWC's seven commissioners appointed by the

---

[3]   https://www.commerce.gov/about (last visited October 12, 2021).
[4]   *Id.*
[5]   *Id.*
[6]   https://floridadep.gov/about-dep (last visited October 15, 2021).
[7]   https://floridakeys.noaa.gov/legislation.html?s=about (last visited October 15, 2021).
[8]   https://myfwc.com/media/3328/agency-organization-operation.pdf (last visited October 12, 2021).
[9]   *Id.*

Governor and confirmed by the Florida Senate to five-year terms[10] and is being sued in that official capacity.  FWC's Commissioners exercise "regulatory and executive powers of the state with respect to wild animal life and fresh aquatic life," as well as "regulatory and executive powers with respect to marine life . . . ."[11]  Commissioner Barreto's current term began on July 19, 2019 and expires on January 5, 2024.

22. Defendant Robert A. Spottswood is one of the FWC's seven commissioners appointed by the Governor and confirmed by the Florida Senate to five-year terms[12] and is being sued in that official capacity.  Commissioner Spottswood's current term began on January 12, 2018 and expires on January 6, 2023.  Commissioner Spottswood served two terms as Chairman of the FWC from 2018 to 2020.[13]

23. Defendant Steven Hudson is one of the FWC's seven commissioners appointed by the Governor and confirmed by the Florida Senate to five-year terms[14] and is being sued in that official capacity.  Commissioner Hudson's current term began on July 19, 2019 and expires on August 1, 2022.

24. Defendant Gary Nicklaus is one of the FWC's seven commissioners appointed by the Governor and confirmed by the Florida Senate to five-year terms[15] and is being sued in that official capacity.  Commissioner Nicklaus' current term began on December 1, 2017 and expires on August 1, 2022.

25. Defendant Gary Lester is one of the FWC's seven commissioners appointed by the

---

[10]    https://myfwc.com/about/commission/commissioners/ (last visited October 12, 2021).
[11]    *Id.*
[12]    https://myfwc.com/about/commission/commissioners/ (last visited October 12, 2021).
[13]    *Id.*
[14]    https://myfwc.com/about/commission/commissioners/ (last visited October 12, 2021).
[15]    https://myfwc.com/about/commission/commissioners/ (last visited October 12, 2021).

Governor and confirmed by the Florida Senate to five-year terms[16] and is being sued in that official capacity.  Commissioner Lester's current term began on January 12, 2018 and expires on August 1, 2022.

26. Defendant Sonya Rood is one of the FWC's seven commissioners appointed by the Governor and confirmed by the Florida Senate to five-year terms[17] and is being sued in that official capacity.  Commissioner Rood current term began on December 1, 2017 and expires on January 2, 2022.

27. Defendant Michael W. Sole is one of the FWC's seven commissioners appointed by the Governor and confirmed by the Florida Senate to five-year terms[18] and is being sued in that official capacity.  Commissioner Sole's current term began on May 12, 2017 and expired on August 1, 2021.

28. Defendant Florida Fish and Wildlife Conservation Commission "manage[s] fish and wildlife resources for their long-term well-being and the benefit of people."[19]  The FWC works together with NOAA and FDEP to enforce regulations within the Florida Keys National Marine Sanctuary.

## JURISDICTION AND VENUE

29. This Court has jurisdiction over the subject matter and the parties pursuant to Article III, Section 2 of the Constitution because the judicial power in law and equity extends to controversies to which the United States is a party.  Jurisdiction is also appropriate under 28 U.S.C. § 1331 because this case arises under the laws of the United States.

30. This Court also has also supplemental jurisdiction over the state law claims pursuant to

---

[16]     https://myfwc.com/about/commission/commissioners/ (last visited October 12, 2021).
[17]     https://myfwc.com/about/commission/commissioners/ (last visited October 12, 2021).
[18]     https://myfwc.com/about/commission/commissioners/ (last visited October 12, 2021).
[19]     https://myfwc.com/media/3328/agency-organization-operation.pdf (last visited October 12, 2021).

28 U.S.C. § 1367(a) because those claims form part of the same claim or controversy under Article III of the United States Constitution.

31. Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1)(B) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred and a substantial part of the property at issue in this action is situated.  Venue is also appropriate in this Court because the parties contractually agreed that all disputes would be resolved before a United States District Court siting in the Southern District of Florida.

## GENERAL ALLEGATIONS

### *Hurricane Wilma Slams into the Florida Keys*

32. As of 11:00 p.m., Friday, October 21, 2005, "extremely dangerous Hurricane Wilma" was located along the Yucatan Peninsula 325 nautical miles southwest of Key West, Florida.

33. The storm remained in that general vicinity until approximately 5:00 a.m., Sunday, October 23, 2005, at which point Hurricane Wilma began moving east toward the Gulf of Mexico and Florida at an accelerating speed.

34. A mere twelve hours later, NOAA located Hurricane Wilma 210 miles from Key West with accelerating forward speed, and seas of 15 to 25 feet.

35. At the same time, NOAA reported Tropical Storm Alpha near the eastern end of Cuba moving north-northwest toward Miami, Florida at about 15 miles per hour, with 12-foot seas.

36. Six hours later, at 11:00 a.m., Sunday, October 23, 2005, NOAA located Hurricane Wilma 120 miles from Key West with a forward speed of about 20 miles per hour and seas of 15 to 25 feet.

37. At the same time, NOAA reported that Tropical Storm Alpha's forward speed toward

Miami had increased to about 18 miles per hour resulting in winds of approximately 50 miles per hour and seas of 12 to 15 feet.

38. NOAA predicted that Tropical Storm Alpha would collide and be "absorbed" by Hurricane Wilma in the vicinity of Florida.

39. By 5:00 a.m., Monday, October 24, NOAA located Hurricane Wilma's eye just 65 miles north-northwest of Key West with a forward speed of 20 miles per hour.

40. Hurricane Wilma would strike the Florida Keys causing millions of dollars in damage. In its assessment of Wilma's impact in the Florida Keys, the National Weather Service noted that insurance payments made in Monroe County, Florida following the storm totaled $208,810,412.00.[20]

### The S/Y Legacy Suffers Catastrophic Damage During Hurricane Wilma

41. *S/Y Legacy* is a 158' foot sailing yacht with a maximum design speed of 13.5 knots in ideal weather conditions. The *Legacy's* design cruising speed under these same ideal conditions is approximately 10 knots.

42. As Hurricane Wilma approached the Florida Keys on October 24, 2005, *Legacy's* crew had already taken all reasonable and necessary precautions to safely ride out the storm, including taking on 10,000 gallons of fuel. *Legacy* was anchored in a location approved by the United States Coast Guard.

43. When NOAA reported Hurricane Wilma was "extremely dangerous," *Legacy* and her crew had three options: (1) head offshore in the hopes of avoiding the hurricane or ride it out at sea; (2) tie up to a dock and evacuate the vessel; or (3) anchor the vessel in an appropriate "hurricane hole."

---

[20] *Id.*

10

44. As conditions deteriorated, it became clear to *Legacy's* master and crew that the vessel would not be able to outrun Wilma.  The storm was approaching faster than *Legacy* could travel given the conditions at sea at the time.  If she fled north, *Legacy* would have been trapped in the Gulf of Mexico.  To the south, *Legacy* would have encountered Tropical Storm Alpha which was developing as Wilma approached.

45. *Legacy* also could not safely dock.  Most commercial docks are not designed for a sailing vessel of *Legacy's* shape.  Even if a dock had been available, the storm surge could have resulted in significant damage to *Legacy* and its fuel tanks, as well as the dock itself.  Moreover, the danger posed by Wilma would have required *Legacy's* crew to evacuate.  Changing wind conditions and tidal surges, however, required that the vessel be constantly adjusted by its crew.

46. Given these conditions, *Legacy's* crew guided the vessel to a "hurricane hole" near marker 15 in the main northwest navigation channel connecting the Atlantic Ocean and Gulf of Mexico.  This location was deep enough to allow *Legacy* to rotate 360 degrees into the wind, while the tidal flats, barrier reefs, and islands minimized the wave hikes from the wind and storm surge. This location also minimized the risk of collision with other vessels that might break free of their moorings.

47. To secure *Legacy*, its crew put out four hundred feet of heavy chains for each of its two main anchors.  A third anchor with six hundred feet of heavy chain was deployed between the main anchors.

48. Latent defects, however, caused the anchors to separate in the early morning hours of October 25, 2005.  The anchors came apart, setting *Legacy* adrift.

49. At first, *Legacy's* crew thought that the anchors had simply come loose.  The crew

struggled for several hours to anchor *Legacy*, not realizing that the anchors had come apart.  The top part of the anchors remained attached to the line, while the bottom portion was in the sand.

50. At around 3:15 a.m. on October 25, *Legacy's* crew still had control of the vessel, although they could not anchor her.  Suddenly, the vessel shuddered, as if rocked by a massive explosion.  The force of Hurricane Wilma's winds had ripped *Legacy's* center mast from its base, sending thousands of pounds of aluminum onto the vessel's wheelhouse.  The main mast came to rest on *Legacy's* port side, partially submerged.

51. The drag caused from the mast and the remaining portion of the anchor helped slow *Legacy* down keeping her and the crew from being sucked into Hurricane Wilma's eye.

52. Nevertheless, *Legacy* and her crew were in a battle to survive.  The vessel pitched violently in 25-foot waves.  Water got inside *Legacy* igniting two separate fires.  The crew was forced to shut down *Legacy's* engines and electronics.  The vessel was dead in the water, her crew at the mercy of the storm.

53. *Legacy's* crew contacted the U.S. Coast Guard for assistance.  Unable to come to *Legacy's* aid, the Coast Guard offered to contact the crew's next of kin.

54. As the sun rose, the waters calmed.  Halmos and a crew member wondered whether they had survived the storm or were getting their first taste of the afterlife.  After further investigation, Halmos realized that *Legacy* had run aground.

### *S/Y Legacy is Forced into the Florida Keys National Marine Sanctuary*

55. Hurricane Wilma forced *Legacy* from her anchorage and into the Great White Heron National Wildlife Refuge, which is contained within the Florida Keys National Marine Sanctuary ("the Sanctuary").

56. The Sanctuary "is one 15 marine protected areas that make up the National Marine

Sanctuary System."[21]  It protects 3,800 square miles of water surrounding the Florida Keys.[22] According to NOAA's website, "once you set foot in Keys waters, you have entered the sanctuary."[23]

57. The Sanctuary is a creature of and is administered under federal law.[24]  However, because sixty percent of the protected area falls within Florida state waters, the Sanctuary "is also effective in these state waters under consent of the State of Florida."[25]

58. Working under a co-trustee agreement, NOAA and the State of Florida jointly manage the Sanctuary.[26]  NOAA's primary management partners are the Florida Department of Environmental Protection, the Florida Fish and Wildlife Conservation Commission, and NOAA's Office of Law Enforcement.[27]

59. In the years following Hurricane Wilma, Halmos and the plaintiff corporate entities named herein have found themselves embroiled in a seemingly never-ending string of investigations, government enforcement actions, and later civil and criminal actions arising from the *S/Y Legacy's* unintentional grounding in the Sanctuary during Hurricane Wilma.

### *The NOAA Agreements*

60. Nearly two years after Hurricane Wilma struck, Halmos and his affiliates and corporate entities, as further defined below, resolved their ongoing dispute with the United States and the State of Florida.

61. The parties entered into two separate written agreements on January 5, 2007.  One

---

[21]     https://floridakeys.noaa.gov/about/welcome.html?s=about (last visited October 13, 2021).
[22]     *Id.*
[23]     *Id.*
[24]     https://floridakeys.noaa.gov/legislation.html?s=about (last visited October 13, 2021).
[25]     *Id.*
[26]     *Id.*
[27]     *Id.*

agreement resolved any claims between Halmos and the United States and the State of Florida, while the other agreement addressed claims between one of Halmos' corporate entities and the governmental parties.  *See* Composite Exhibit "A".

62. In one agreement, "Peter Halmos and Affiliates" contracted with NOAA and the State of Florida.  *See* Halmos/NOAA Agreement at Composite Exhibit "A".  The parties were defined broadly:

> PETER HALMOS and his immediate family members individually, including but not limited to PETER HALMOS and all of their direct or indirect corporations and affiliates, trusts and tangible and/or intangible interests; and all shareholders, employees, agents, partners, partnerships, representatives, subsidiaries, trusts, affiliates, heirs, and assigns of any of the foregoing including but limited to any alleged capacity as an operator of *S/Y Legacy*.  This does not include Peter Halmos in his capacity as a owner, shareholder, director, officer, employee, agent, partner or representative of IYC.

*See* Halmos/NOAA Agreement at Exhibit "A" at ¶1.3.  The Agreement further defined NOAA as "acting in all of its capacities, including but not limited to that of Natural Resources Trustee and Sanctuary manager for the SANCTUARY."  *Id.* at ¶1.4.

63. Halmos' company, International Yachting Charters, Inc. ("IYC"), entered into a substantially similar agreement with NOAA and The State of Florida.  *See* IYC/NOAA Agreement at Composite Exhibit "A".  In this second agreement, IYC was defined to mean and include

> *S/Y Legacy* and her tenders (*in rem*), including its owner, all officers and crew of *S/Y Legacy*; and all shareholders, directors, officers, employees, agents, partners, partnerships, representatives, subsidiaries, trusts, affiliates, successors and assigns of any of the foregoing including but not limited to any alleged capacity as an operator of *S/Y Legacy*.  This does not include Peter Halmos in his non-corporate individual capacity.

*See* IYC/NOAA Agreement at Composite Exhibit "A" at ¶1.3.  NOAA and the State of Florida

were defined as in the first agreement.  *See* IYC/NOAA Agreement at Composite Exhibit "A" at

¶¶1.4-1.5.

64. The NOAA Agreements further defined the term "Parties" or "Party" to include Peter

Halmos and his Affiliates and IYC on the one hand and NOAA and the State of Florida on the

other.  *See* Halmos/NOAA Agreement at Exhibit "A" at ¶1.6; *see also* IYC/NOAA Agreement at

Composite Exhibit "A" at ¶¶1.6.

65. The intent of the Halmos and IYC parties on the one hand and the NOAA and the State

of Florida parties on the other hand was clear – (1) to resolve all disputes between the parties

relating to and arising from the subject-matter of the Agreements*;* (2) to preclude NOAA and

Florida from aiding any non-parties to the NOAA Agreements in any legal actions relating to or

arising from the subject-matter of the Agreements; and (3) to require NOAA and Florida to come

to Halmos and his Affiliates and/or IYC's aid should they be sued or wish to sue in connection

with the subject-matter of the Agreements.

66. To that end, the NOAA Agreements contain explicit language fully, finally, and forever

resolving the parties' dispute:

### 3.    Mutual Stipulations

The PARTIES hereby stipulate:

That all PARTIES desire and intend hereby to avoid the further
expense, inconvenience, and uncertainty of protracted litigation, and
to settle all disputes, controversies and CLAIMS, whether asserted
or unasserted, by and between the PARTIES, directly or indirectly
arising from, referring to and/or concerning the Subject Matter of
this AGREEMENT in the manner and upon the terms and conditions
set forth in this AGREEMENT so as to irrevocably, finally and
without further recourse settle, release or assign, compromise, and
discharge fully all CLAIMS of all PARTIES against the other

> PARTIES, and by which the PARTIES are forever buying their peace.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶ 3.5; *see also* IYC/NOAA

Agreement at Composite Exhibit "A" at ¶3.6.

67. Critically, NOAA and the State of Florida concluded that Halmos and IYC were "not guilty of any unreasonable omission, to prevent the grounding of *S/Y Legacy* before and during the onslaught of Hurricane Wilma, and to minimize any alleged damage to the SANCUTARY and all natural resources as a result thereof and thereafter."  *See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶ 2.13; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶2.13.

68. The Agreements further provided that should any party breach their Agreement, the protections further detailed below would be lost and would expose the breaching party to significant potential liability:

> Should any PARTY breach this AGREEMENT by directly or indirectly asserting any CLAIM released or assigned by that PARTY herein against any other PARTY, and/or in any way instituting indirectly what is prohibited by this AGREEMENT from being done directly, then the release or assignment provided by the PARTY against whom such a CLAIM is asserted or in any manner enforced shall become null and void and of no benefit to the PARTY asserting such CLAIM.  The release or assignment of the PARTY wrongfully so doing shall remain valid and in full force and effect and may be asserted as a defense to such CLAIM by the PARTY against whom the wrongful CLAIM is brought.  In such event, the breaching PARTY shall be liable for damages, injuries, costs and expenses, including reasonable attorneys, experts, researchers, consultants, investigators, and advisors fees, through all available appeal, to the non-breaching party to be determined in a lawful tribunal by a constitutionally constituted jury applying a "preponderance of the evidence" standard of proof.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶ 4.8; *see also* IYC/NOAA

Agreement at Composite Exhibit "A" at ¶4.9.

69. As part of the agreements, NOAA and the State of Florida agreed to very broad covenants not to sue either Halmos or IYC:

**5.      Covenant Not to Sue**

**5.1**      …The GOVERNMENTAL ENTITIES further unconditionally, fully, irrevocably and finally agree and covenant forever not to directly or indirectly cause, instigate and/or encourage any other person or entity to engage in such above-referenced conduct including to file, prosecute, commence, institute or continue any administrative enforcement actions, complaint, suit, legal or equitable proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute against PETER HALMOS AND AFFILIATES, any matter of any and every kind and nature whatsoever, whether known or unknown, and whensoever or however occurring, arising directly or indirectly from or having any direct or indirect connection with the Subject Matter of this AGREEMENT.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶5.1; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶5.1.

70. In addition to the broad covenants not to sue, NOAA and the State of Florida agreed to help Halmos and IYC should they be sued or should they sue in connection with the subject-matter of the Agreements:

**6.      Cooperation**

**6.1**      Should any Non-Party at any time assert any claim or bring any action against of the PARTIES herein and/or should any of the PARTIES assert any claim or bring any action against a Non-Party directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, the other PARTIES shall cooperate with the PARTY against or by whom such a claim is asserted or action brought to the maximum extent not expressly prohibited by law, to defend against such claim or action and to seek any and all lawful redress against any Non-Party that is not expressly prohibited by law. NOAA and PETER HALMOS will cooperate in all respects to effectuate the purposes and performance specified in this Agreement.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶6.1; *see also* IYC/NOAA

Agreement at Composite Exhibit "A" at ¶6.1.

71. To give more "teeth" to their agreement, NOAA and the State of Florida further agreed

not to aid, directly or indirectly, any other person or entity in litigation against Halmos or IYC:

> 6.2.    The GOVERNMENTAL ENTITIES agree not to, directly or
> indirectly through one or more intermediaries, intentionally provide
> any compensation, benefits, material non-public information
> concerning PETER HALMOS AND AFFILIATES, assistance
> and/or cooperation to any Non-Party who at any time now and/or in
> the future asserts any allegation, claim and/or adverse conduct
> against or toward PETER HALMOS AND AFFILIATES, and/or
> against whom PETER HALMOS AND AFFILIATES asserts any
> claim and/or allegations, directly or indirectly arising from, relating
> to and/or concerning the Subject Matter of this AGREEMENT, in
> any threatened, pending or future event, course of conduct and/or
> proceeding of every nature  or kind, except to the extent required by
> law or legal process; and in such instance only after ten (10) days
> advance written notice to PETER HALMOS AND AFFILIATES of
> such proposed action (unless a shorter period is ordered by a lawful
> tribunal) and only after that GOVERNMENTAL ENTITY'S
> counsel has concluded that such action is required by law and the
> requested information and/or other legal process is disclosed to
> PETER HALMOS AND AFFILIATES at such time and manner
> whereby PETER HALMOS AND AFFILIATES'S due process
> rights are fully protected.  The GOVERNMENTAL ENTITIES
> further agree that they will not directly or indirectly contact or
> encourage any taxing, enforcement or regulatory agencies and
> personnel to investigate, audit, take administrative action against,
> sue, or otherwise assert any claim and/or action against PETER
> HALMOS AND AFFILIATES.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶6.2; *see also* IYC/NOAA Agreement

at Composite Exhibit "A" at ¶6.2.

72. As part of their broad agreement, the parties agreed that the failure, by either side, to

strictly perform the terms of the NOAA agreement, would lead to irreparable harm.  To address

this issue, the parties further agreed to injunctive relief in the form of specific performance of the

NOAA Agreements:

### Specific Performance

The PARTIES acknowledge and agree that each would be irreparably damaged in the event that any of the provisions of this AGREEMENT are not fully and strictly performed in accordance with their specific terms or are otherwise breached. It is accordingly hereby agreed that each PARTY shall be entitled to seek an injunction (or injunctions) to prevent breaches of this AGREEMENT by any other PARTY hereto and to specifically enforce this AGREEMENT and the terms and provisions thereof against any other PARTY hereto. The selection of Specific Performance as a requested remedy in no way waives any rights to any other remedy that may be available to that PARTY at law or in equity or otherwise.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶13; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶14.

### *Halmos and IYC Are Sued in Monroe County, Florida/*
### *Halmos Suffers a Traumatic Brain Injury*

73. Even though Halmos and IYC fully intended to buy peace forever through the agreements with NOAA and the State of Florida, the opposite has happened. Instead of peace, Halmos and his related entities have remained embroiled in an ongoing series of investigations, regulatory actions, civil litigation, and criminal prosecutions.

74. In addition to the costs in time and treasure that these actions have had on Halmos and his related entities, Halmos himself has also suffered severe physical injury. On March 25, 2021, while visiting a private home, Halmos fell and struck his head. Halmos, who had never visited the home before, did not see a step leading into a sunken room. The fall caused Halmos, who is nearly eighty years old, to lose consciousness and left him concussed. But for the fact that Halmos was searching for a new location to dock *Legacy* following its eviction from its dock in Key West, Florida, Halmos would not have been visiting the property on March 25th.

75. Halmos' treating physician determined that Halmos suffered a traumatic brain injury

because of the fall.  His symptoms include acute post-traumatic headaches, sleep disturbances, nausea, imbalance, scleredema, and various cognitive issues.  Additionally, Halmos has "difficulty concentrating, remembering, speaking, and reading."  According to Halmos' treating physician, stress exacerbates these symptoms.

76. This lawsuit seeks to bring Halmos and his related entities the peace he contracted for in 2007.

## CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT
### (AGAINST ALL DEFENDANTS)

77. Plaintiffs re-allege paragraphs 1 through 76.

78. When Hurricane Wilma struck the Florida Keys in 2005, it wreaked havoc.  Among the storm's victims was *S/Y Legacy*, which was driven into the Great White Heron National Wildlife Refuge within the Florida National Marine Sanctuary, through no fault of its master and crew.

79. After the storm, Halmos and certain of his corporate entities were ensnared in a series of seemingly never-ending investigations, regulatory actions, civil lawsuits, and criminal prosecutions.

80. In 2007, Peter Halmos and his Affiliates and IYC entered separate written agreements with NOAA and the State of Florida.

81. Through the NOAA Agreements, the parties were "forever buying their peace."

82. As part of these peace agreements, NOAA and the State of Florida covenanted (1) not to sue Halmos and/or IYC; (2) not to directly or indirectly cause, instigate, or encourage another party to sue in connection with any matter related to or arising from the subject-matter of the

NOAA Agreements; (3) to cooperate and defend Halmos and IYC against any claim or action brought by a non-party relating to or arising from the subject-matter of the NOAA Agreements; (4) to aid Halmos and IYC in any claims they may bring relating to or arising from the subject-matter of the NOAA Agreements; and (5) to refrain from providing any form of aid or assistance to any non-party against Halmos and/or IYC in any matter relating to or arising from the subject-matter of the NOAA Agreements.

83. The NOAA Agreements further provide that the parties' failure to specifically perform the terms of the agreements would result in irreparable harm for which there exists no adequate remedy at law.

84. To ensure that the parties would honor the terms of the NOAA Agreements, the contracts further provide for the remedy of specific performance where one party fails to strictly enforce the terms of the agreements.

85. Halmos, IYC, and certain other of Halmos' companies are currently the subject of two lawsuits pending in the Circuit Court of Monroe County, Florida.  The subject-matter of both lawsuits relate to and arise from the subject matter of the NOAA Agreements.

86. Under the broadly worded covenants included in the NOAA Agreements, both NOAA and the State of Florida are contractually bound to (1) cooperate with Halmos and IYC in their defense of these actions and (2) refrain from providing any form of aid or support to the non-parties bringing these actions.

87. Despite requests by both Halmos and IYC, neither NOAA, nor the State of Florida have taken any steps to perform as required under the NOAA Agreements.

88. NOAA and IYC's ongoing failure to strictly enforce the terms of the NOAA Agreements constitute a breach of contract which is damaging Halmos and IYC.

WHEREFORE, Plaintiffs Peter Halmos, International Yachting Charter Services, and High Plains Capital Corporation, respectfully request that this Court enter a judgment for breach of contract in favor of Peter Halmos and his Affiliates and IYC and against Richard W. Spinard, the National Oceanic and Atmospheric Administration, Gina M. Raimondo, the United States Department of Commerce, Eric Sutton, the Florida Department of Environmental Protection, Shawn Hamilton, Thomas Reinert, Rodney Barreto, Robert A. Spottswood, Steven Hudson, Gary Nicklaus, Gary Lester, Sonya Rood, Michael W. Sole, and the Florida Fish and Wildlife Conservation Commission, plus prejudgment interest, reasonable attorneys' fees, costs, and such other and further relief as this Court deems just, equitable, and proper.

## COUNT TWO
## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
## (AGAINST ALL DEFENDANTS)

89. Plaintiffs re-allege paragraphs 1 through 76.

90. Peter Halmos and his Affiliates and IYC are parties to separate agreements with NOAA and the State of Florida.

91. Florida law and, specifically, the implied covenant of good faith and fair dealing, mandates that NOAA and the State of Florida act in good faith and deal with Halmos and his Affiliates and IYC in good faith.

92. NOAA and the State of Florida have consciously and deliberately failed to act in good faith. More specifically, NOAA and the State of Florida have failed to honor, perform, and comply with their obligations as defined and set forth in paragraphs 3 through 6 of the respective NOAA Agreements.

93. As a result of NOAA and the State of Florida's failure to honor the terms of the NOAA

Agreements, Peter Halmos and IYC have been exposed to the inconvenience and costs of multiple investigations, regulatory actions, civil lawsuits, and criminal prosecutions in Monroe County, Florida.

94. NOAA and the State of Florida's failure to honor the terms of the NOAA Agreements have frustrated the contracts' purpose and contravened the reasonable expectation of Halmos and his Affiliates and IYC.

95. As a result of the foregoing, Halmos and his Affiliates and IYC have been damaged.

WHEREFORE, Plaintiffs Peter Halmos, International Yachting Charter Services, and High Plains Capital Corporation, respectfully request that this Court enter a judgment for breach of the implied covenant of good faith and fair dealing in favor of Peter Halmos and his Affiliates and IYC and against Richard W. Spinard, the National Oceanic and Atmospheric Administration, Gina M. Raimondo, the United States Department of Commerce, Eric Sutton, the Florida Department of Environmental Protection, Shawn Hamilton, Thomas Reinert, Rodney Barreto, Robert A. Spottswood, Steven Hudson, Gary Nicklaus, Gary Lester, Sonya Rood, Michael W. Sole, and the Florida Fish and Wildlife Conservation Commission, plus prejudgment interest, reasonable attorneys' fees, costs, and such other and further relief as this Court deems just, equitable, and proper.

## COUNT THREE
## SPECIFIC PERFORMANCE
## (AGAINST ALL DEFENDANTS)

96. Plaintiffs re-allege paragraphs 1 through 76.

97. In 2007, Peter Halmos and his Affiliates and IYC entered into separate written agreements with the National Oceanic and Atmospheric Administration and the State of Florida.

98. Under the agreements, NOAA and the State of Florida covenanted (1) not to sue

Halmos and/or IYC; (2) not to directly or indirectly cause, instigate, or encourage another party to sue in connection with any matter related to or arising from the subject-matter of the NOAA Agreements; (3) to cooperate and defend Halmos and IYC against any claim or action brought by a non-party relating to or arising from the subject-matter of the NOAA Agreements; (4) to aid Halmos and IYC in any claims they may bring relating to or arising from the subject-matter of the Agreements; and (5) to refrain from providing any form of aid or assistance to any non-party against Halmos and/or IYC in any matter relating to or arising from the subject-matter of the Agreements.

99. Halmos and IYC are clearly entitled to specific performance of the above-referenced covenants. The NOAA Agreements provide that the parties shall have the right to "specifically enforce this AGREEMENT and the terms and provisions thereof against any other PARTY hereto."

100. Further, Halmos and IYC are entitled to specific performance because there is no adequate remedy at law. The NOAA Agreements both state that the parties "would be irreparably damaged in the event that any of the provisions of this AGREEMENT are not fully and strictly performed in accordance with their specific terms or are otherwise breached."

101. Justice also requires that specific performance be ordered in this case. Contracts represent the written embodiment of shared duties and obligations with respect to nearly every aspect of our daily lives. Accordingly, contracts must be enforced to the fullest extent contemplated by the parties and allowed by law. Nowhere is this more important than in those agreements made by governmental entities. To function, the government must have the trust of its citizens. When the government breaches that trust by failing to honor its commitments, the courts must step in to do justice.

WHEREFORE, Plaintiffs Peter Halmos, International Yachting Charter Services, and High Plains Capital Corporation, respectfully request that this Court enter a judgment for specific performance in favor of Peter Halmos and his Affiliates and IYC and against Richard W. Spinard, the National Oceanic and Atmospheric Administration, Gina M. Raimondo, the United States Department of Commerce, Eric Sutton, the Florida Environmental Protection Agency, Shawn Hamilton, Thomas Reinert, Rodney Barreto, Robert A. Spottswood, Steven Hudson, Gary Nicklaus, Gary Lester, Sonya Rood, Michael W. Sole, and the Florida Fish and Wildlife Conservation Commission, as well as reasonable attorneys' fees, costs, and such other and further relief as this Court deems just, equitable, and proper.

### COUNT FOUR
### TEMPORARY, PRELIMINARY,
### AND PERMANENT INJUNCTIVE RELIEF
### (AGAINST ALL DEFENDANTS)

102.  Plaintiffs re-allege paragraphs 1 through 76.

103.  In 2007, Peter Halmos and his Affiliates and IYC entered into two separate agreements with NOAA and The State of Florida to resolve a series of long-running administrative investigations and actions relating to and arising from the damage suffered by *S/Y Legacy* during Hurricane Wilma.

104.  Halmos and IYC have a substantial likelihood of success on the merits.  As relevant here, the NOAA Agreements contain clear covenants that require NOAA and the State of Florida (1) not to sue Halmos and/or IYC; (2) not to directly or indirectly cause, instigate, or encourage any other person or entity to sue in connection with any matter related to or arising from the subject-matter of the Agreements; (3) to cooperate and defend Halmos and IYC against any claim or action brought by a non-party relating to or arising from the subject-matter of the Agreements; (4) to aid Halmos and IYC in any claims they may bring relating to or arising from the subject-

25

matter of the Agreements; and (5) to refrain from providing any form of aid or assistance to any non-party against Halmos and/or IYC in any matter relating to or arising from the subject-matter of the Agreements.

105. There is no adequate remedy at law to compensate Halmos and IYC for the harm they are suffering. Through the NOAA Agreements, the parties contemplated that NOAA and the State of Florida would cooperate with and defend Halmos and IYC in any action filed by a non-party relating to and arising from the subject-matter of the Agreements. Money damages will not adequately compensate Halmos and IYC for NOAA and the State of Florida's failure to lend aid and support in connection with the ongoing investigations, administrative actions, civil lawsuits, and criminal prosecutions in Monroe County, Florida.

106. As part of their agreements, both NOAA and the State of Florida stipulated that Halmos and IYC "would be irreparably damaged in the event that any of the provisions of this AGREEMENT are not fully and strictly performed in accordance with their specific terms or are otherwise breached."

107. A temporary, preliminary, and permanent injunction will serve the public interest by enforcing the terms of a valid contract between government entities on the one hand and private citizens on the other. The public has a right to expect and demand that contracts with public entitles like NOAA and the State of Florida will be subject to the same rules and will be enforced in the same manner as any other contractual agreement.

WHEREFORE, Peter Halmos respectfully requests that a temporary, preliminary, and permanent injunction be entered against Richard W. Spinard, the National Oceanic and Atmospheric Administration, Gina M. Raimondo, the United States Department of Commerce, Eric Sutton, the Florida Department of Environmental Protection, Shawn Hamilton, Thomas

Reinert, Rodney Barreto, Robert A. Spottswood, Steven Hudson, Gary Nicklaus, Gary Lester, Sonya Rood, Michael W. Sole, and the Florida Fish and Wildlife Conservation Commission, which temporarily, preliminarily, and permanently enjoins and restrains Defendants from violating and/or failing to strictly perform under the various NOAA Agreements, awards attorneys' fees and costs, retains continuing jurisdiction over the parties and subject matter to enforce the terms and conditions of this Order, and awards such other and further relief as this Court deems just and equitable under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all matters so triable.

Respectfully submitted:

**CARLOS F. GONZALEZ, P.A.**
2332 Galiano Street
Second Floor
Coral Gables, Florida 33134
Tel. 786.410.7662
Email: cfg@carlosfgonzalez.com

By: */s/ Carlos F. Gonzalez*
Carlos F. Gonzalez
Florida Bar No. 494631

*Counsel for Peter Halmos,*
*International Yachting Charter*
*Services, and High Plains Capital*
*Corporation*

-And-

Guy A. Lewis
Florida Bar No. 623740
The Law Offices of Guy A. Lewis
12575 Southwest 67th Avenue
Pinecrest, Florida 33156
Email: lewis@lewistein.com

*Counsel for Peter Halmos*

# COMPOSITE EXHIBIT A

## AGREEMENT AND MUTUAL RELEASE

This Agreement and Mutual Release dated as of January ___5___, 2007, is entered into by, among and between the PARTIES, as defined below.

### 1.   Definitions

The following defined terms shall have the meaning stated:

1.1    The term "AGREEMENT" means this Agreement and Mutual Release.

1.2    The term "Subject Matter of this AGREEMENT" means the grounding of S/Y *Legacy* in the SANCTUARY on or about October 24, 2005, the time S/Y *Legacy* has remained grounded there, and the salvage/recovery/removal operation to remove S/Y *Legacy* from the SANCTUARY.

1.3    The term "PETER HALMOS AND AFFILIATES" means PETER HALMOS and his immediate family members individually, including but not limited to PETER HALMOS' and all of their direct or indirect corporations and affiliates, trusts and tangible and/or intangible interests; and all shareholders, directors, officers, employees, agents, partners, partnerships, representatives, subsidiaries, trusts, affiliates, heirs, and assigns of any of the foregoing including but limited to any alleged capacity as an operator of S/Y *Legacy*. This does not include Peter Halmos in his capacity as a owner, shareholder, director, officer, employee, agent, partner or representatives of IYC.

1.4    The term "NOAA" means the National Oceanic and Atmospheric Administration. This includes NOAA acting in all of its capacities, including but not limited to that of Natural Resource Trustee and Sanctuary manager for the SANCTUARY.

1.5    The term "FLORIDA" means the State of Florida, including all of its agencies and departments.

1.6    The term "PARTIES" or "PARTY" to this AGREEMENT refers only to PETER HALMOS AND AFFILIATES, NOAA, and FLORIDA (to the extent that FLORIDA has executed this AGREEMENT), collectively or individually.

1.7    The term "GOVERNMENTAL ENTITIES" means NOAA and FLORIDA, collectively or individually.

1.8    The term "GOVERNMENTAL CLAIMS," when used in relation to a potential claim of the GOVERNMENTAL ENTITIES against PETER HALMOS AND AFFILIATES, comprehensively means any and all claims, causes of action, allegations, demands, assertions and/or course of conduct of any nature and type whatsoever including for damages, losses, compensation, injuries, response costs, remediation, restoration, loss of use and/or ecological and other services flow, monitoring, repair, evaluation, interest, liens, forfeiture, equitable relief, compensation, benefits, demands, costs and expenses including attorneys' fees (and expenses for experts, consultants, advisors, government employees and resources) and any other relief, and comprehensively includes, but is not limited to, damages and

Initials: Peter Halmos ____ ; NOAA ____

response costs as defined at 16 U.S.C. § 1432, civil penalties, forfeiture and costs (under 16 U.S.C. § 1437), and any damages, response costs and interest under 16 U.S.C. § 1443, pursuant to the National Marine Sanctuary Act (16 U.S.C. §§ 1431 et seq), the Florida Keys National Marine Sanctuary and Protection Act (104 Stat. 3089) and/or the implementing regulations promulgated pursuant thereto (15 C.F.R. Part 922), whether direct or indirect of every nature and kind whatsoever, without restriction or limitation including natural resources, marine, avian and all other organisms, whether living or dead, including flora and fauna of every nature and kind, environment, ecosystem, habitat, and whether known or unknown, arising from any asserted ownership or trusteeship pertaining to the SANCTUARY seabed and/or sanctuary resources, as defined in the National Marine Sanctuary Act at 16 U.S.C. § 1432(8), and/or arising from any other direct or indirect assertion of right, authority, custom, treaty, protocol, and all other bases whether lawful or unlawful which now and in the future may exist by any of the GOVERNMENTAL ENTITIES, arising from or relating in any way to the Subject Matter of this AGREEMENT.

1.9   The term "PETER HALMOS CLAIMS," when used in relation to a potential claim of PETER HALMOS against the GOVERNMENTAL ENTITIES, means any and all claims for damages directly or indirectly resulting from any alleged taking, violation of Fifth Amendment due process rights, personal injuries, delay, and loss of use of S/Y *Legacy*, and comprehensively includes, but is not limited to, all causes of action, all claims for compensation or benefits, demands, damages (including without limitation claims for attorney's fees or expenses, and any claims for expert or consultant fees or expenses), arising from or relating in any way to the Subject Matter of this AGREEMENT.

1.10   The term "CLAIMS" means the aggregation of GOVERNMENTAL CLAIMS and PETER HALMOS CLAIMS.

1.11   The term "ACE-INA" means the Insurance Company of North America. ACE-INA is a Non-Party to this AGREEMENT.

1.12   The term "SANCTUARY" means the Florida Keys National Marine Sanctuary.

2.   **Averments**

PETER HALMOS AND AFFILIATES are in possession of certain facts pertaining to the Subject Matter of this AGREEMENT.  In relevant part, certain key facts are stated in this Section 2.  NOAA has made an independent inquiry with PETER HALMOS AND AFFILIATES' full cooperation, and has found no basis to dispute them.

2.1   S/Y *Legacy* is a 158' luxury sailing yacht. S/Y *Legacy's* maximum design speed is approximately 13.5 knots in ideal weather conditions and clean hull, with half its fuel capacity.   S/Y *Legacy's* design cruising speed under these same ideal conditions is approximately 10 knots.

2.2   As of 11:00 p.m. EDT, Friday, October 21, 2005, "extremely dangerous" Hurricane Wilma" was located along the Yucatan Peninsula 325 nautical miles southwest of Key West, Florida.  It remained in that general vicinity until approximately 5:00 a.m. EDT, Sunday,

2   Initials: Peter Halmos ___ ; NOAA

October 23, 2005, at which time it began moving east toward the Gulf of Mexico and Florida at an accelerating speed. NOAA located Wilma 305 miles from Key West with Gulf of Mexico and Florida Atlantic seas already 6 – 12 feet. Just 12 hours later, NOAA located Wilma 210 miles from Key West with accelerating forward speed, reporting Gulf of Mexico and Florida Atlantic seas of 15 – 25 feet. Concurrently, NOAA located Tropical Storm Alpha near the eastern end of Cuba moving north-northeast toward Miami at about 15 mph, reporting 12-foot seas.

2.3     Six hours later, at 11:00 p.m. EDT, Sunday, October 23, NOAA located Wilma 120 miles from Key West with forward speed of about 20 mph causing 15 – 25 foot seas. At the same time, NOAA reported Alpha's forward speed toward Miami had increased to about 18 mph resulting in winds of about 50 mph and seas 12 – 15 feet. NOAA predicted Alpha to collide with and be "absorbed" by Wilma in the vicinity of Florida. By 5:00 a.m. EDT, Monday, October 24, NOAA located Wilma's eye just 65 miles north-northwest of Key West with 20 mph forward speed.

2.4     At the time that Hurricane Wilma was along the Yucatan Peninsula on October 21, S/Y *Legacy* had taken reasonable and necessary precautions including refueling for full tanks (10,000 gallons) essential for avoiding Wilma.

2.5     When NOAA reported Hurricane Wilma was "extremely dangerous" and moving from the Yucatan toward Florida, S/Y *Legacy* had three options:  (1) running offshore to try to avoid the hurricane, and if not able to avoid it, to try to ride it out at sea; (2) go to a dock, tie up, and remove all persons from the boat for them to seek shelter; or (3) anchor in an appropriate "hurricane hole."

2.6     S/Y *Legacy* could not hope to outrun Wilma by going east.  Wilma was approaching much faster than S/Y *Legacy* could outrun in 6 – 12 foot seas, building to 15 – 25 feet, and would certainly overtake her.  Any attempt to outmaneuver the hurricane contained a great risk that the hurricane would trap the boat in the open sea where, combined with 15 – 25 foot seas, S/Y *Legacy* would likely capsize.  To the north, S/Y *Legacy* would have been trapped in the Gulf of Mexico by the panhandle and peninsula coasts of Florida.  To the south, Tropical Storm Alpha was rapidly heading toward Miami pushing 12 foot seas.  NOAA predicted Wilma and Alpha would collide with Wilma absorbing Alpha to become even stronger.  Therefore, going south to try to avoid Wilma was not an option for S/Y *Legacy*.

2.7     The captain and owner of S/Y *Legacy*, along with PETER HALMOS AND AFFILIATES, were keenly aware and influenced by the fate of the commercial sailing vessel *Fantome* in 1998, among others.  The *Fantome* was a 282' steel hulled vessel, much larger and more formidable than S/Y *Legacy*.  The captain and crew of the *Fantome* tried to run offshore to avoid Hurricane Mitch.  They tried without success to guess which direction that hurricane was going.  Unable to outrun or outmaneuver the hurricane, the *Fantome* became trapped between the hurricane and the coasts of Honduras and Belize.  The attempt to then ride out the storm at sea resulted in the total loss of the vessel and all 31 crew members.  S/Y *Legacy* cannot survive 15 – 25 foot seas in a hurricane, nor the 35 – 45 foot seas likely when Alpha collided with Wilma.  Evading Wilma was not an option.

3    Initials: Peter Halmos ____ ; NOAA ____

2.8     Docking was also not an option. Most commercial docks are not designed for a sailboat of S/Y *Legacy's* shape, with its curved sides. Even if a dock were available, the storm surge could cause S/Y *Legacy* to destroy the dock and/or cause a rupture of her fuel tanks. The dangers from pilings and other vessels would have required S/Y *Legacy's* crew to abandon S/Y *Legacy* until the hurricane passed, dooming S/Y *Legacy* because the changing wind direction and tidal surges require constant adjusting of lines.

2.9     As one of the reasonably necessary precautions taken by S/Y *Legacy*, a sheltered "hurricane hole" had been selected in the event severe weather necessitated. In this location, shallow tidal flats and nearby islands provided protection from the 15 – 25 foot seas raging offshore in the Atlantic and Gulf of Mexico. Throughout the complete time period that Hurricane Wilma was in the vicinity of S/Y *Legacy*, the full compliment of the crew was present and aboard S/Y *Legacy* in order to be able to respond to the changing conditions and circumstances presented by Hurricane Wilma.

2.10    S/Y *Legacy's* "hurricane hole" near marker 15 in the main northwest navigation channel connecting the Atlantic and Gulf of Mexico has ample water depth to allow S/Y *Legacy* to rotate 360 degrees into the wind at all times while the tidal flats, barrier reefs and islands minimized the wave hikes from the wind and storm surge. This location also minimized the risk of collision with other vessels that inevitably break their moorings.

2.11    S/Y *Legacy* put out 400' of rode for the main anchors. This amounted to a 14:1 ratio of rode to depth. The standard for anchoring with a storm approaching is 10:1. A third anchor with 600' of line was deployed equidistant between the two main anchors.

2.12    S/Y *Legacy* was positioned at anchor so as to face into the wind and to allow for 360 degrees of movement as the wind direction changed.

2.13    Throughout the whole time period involving Hurricane Wilma, all persons, entities, and interests defined herein under the term PETER HALMOS AND AFFILIATES, and all others if not expressly identified, were not guilty of any unreasonable omission, to prevent the grounding of S/Y *Legacy* before and during the onslaught of Hurricane Wilma, and to minimize any alleged damage to the SANCTUARY and all natural resources as a result thereof and thereafter.

**3.     Mutual Stipulations**

The PARTIES hereby stipulate:

3.1     That on or about October 24, 2005, S/Y *Legacy* was involuntarily, unintentionally, and of necessity forced aground in the SANCTUARY by, during, and as a result of Hurricane Wilma.

3.2     That all persons, entities, and interests defined herein under the term PETER HALMOS AND AFFILIATES, and all others if not expressly identified, did what was reasonably necessary and prudent while acting with due care and in good faith after taking reasonable and necessary precautions to prevent the grounding of S/Y *Legacy* before and during

4     Initials: Peter Halmos _____ ; NOAA _____

HALMOS AND AFFILIATES alleges certain CLAIMS against the GOVERNMENTAL ENTITIES, and some or all of the GOVERNMENTAL ENTITIES allege certain CLAIMS against PETER HALMOS AND AFFILIATES.

3.4    That all PARTIES deny the alleged CLAIMS.

3.5    That all PARTIES desire and intend hereby to avoid the further expense, inconvenience, and uncertainty of protracted litigation, and to settle all disputes, controversies and CLAIMS, whether asserted or unasserted, by and between the PARTIES, directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT in the manner and upon the terms and conditions set forth in this AGREEMENT so as to irrevocably, finally and without further recourse settle, release or assign, compromise, and discharge fully all CLAIMS of all PARTIES against the other PARTIES, and by which the PARTIES are forever buying their peace.

3.6    That each PARTY has conducted sufficient due diligence to enable it to irrevocably enter into this AGREEMENT, and to confirm as accurate and true these Stipulations.

**4.    Consideration**

In consideration of the mutual releases or assignment and other provisions of this AGREEMENT, and other good and valuable consideration as set forth herein, all of which constitute good and valuable consideration each PARTY provides the following consideration to the other PARTY(s) pursuant to this AGREEMENT:

4.1    The GOVERNMENTAL ENTITIES hereby release all of their rights, defenses and CLAIMS against PETER HALMOS AND AFFILIATES, as of the date of their execution of this AGREEMENT as more comprehensively defined in Paragraph 4.7 below. At anytime within one (1) year of the date of the execution of this AGREEMENT by NOAA, NOAA may, with the authorization of the Secretary of Commerce, convert its foregoing release to an assignment of all of NOAA's rights, defenses and CLAIMS against PETER HALMOS AND AFFILIATES, to PETER HALMOS. No action shall be taken regarding this assignment absent a request from PETER HALMOS AND AFFILIATES. Upon authorization from the Secretary of Commerce being granted, the release shall automatically convert into the said assignment, which assignment shall be effective as of the date of NOAA's execution of this AGREEMENT. Should such authorization not be granted by the Secretary of Commerce within the one (1) year period, the release shall thereafter and forever remain a full, unconditional and irrevocable release.

4.2    PETER HALMOS hereby releases all of his rights, defenses and CLAIMS against the GOVERNMENTAL ENTITIES as of the date PETER HALMOS and NOAA duly execute this AGREEMENT as more comprehensively defined in Paragraph 4.7 below, and as qualified in Paragraph 4.4 below. Nothing herein releases any claims that PETER HALMOS AND AFFILIATES may have against all Non-Parties, and PETER HALMOS AND

5    Initials: Peter Halmos _____; NOAA _____

AFFILIATES hereby expressly reserves all of their rights, claims, and defenses as to all Non-Parties.

     4.3    Contemporaneously with this AGREEMENT, another agreement is being entered into between NOAA and International Yachting Charters, Inc. ("IYC"), whereby IYC is depositing a sum of money with Thomas Campbell as an escrow agent to secure payment for the removal of S/Y *Legacy* from the SANCTUARY. Nothing pertaining to the provisions of that agreement between NOAA and IYC shall ever be utilized by any PARTY to assert a conflict of interest or otherwise attempt to disqualify Thomas Campbell and/or the firm of Pillsbury Winthrop Shaw Pittman, LLP, from representing PETER HALMOS AND AFFILIATES. The PARTIES, by their execution of this AGREEMENT, hereby waive any conflict of interest pertaining to Thomas Campbell and/or the firm of Pillsbury Winthrop Shaw Pittman, LLP, as pertains to their representation of PETER HALMOS AND AFFILIATES.

     4.4    This AGREEMENT, and all consideration and benefits provided for herein, shall be binding and in full force and effect upon the signature of both PETER HALMOS and NOAA, if duly executed by PETER HALMOS and NOAA no later than midnight p.m. EST January ___8___, 2007.  Should FLORIDA not execute this AGREEMENT (herein any non-signatory is referred to as a "Non-Party") no later than January 31, 2007, the release contained in Paragraph 4.2 above, this AGREEMENT, and any and all other alleged restriction or adverse affect to PETER HALMOS'S rights, claims and defenses against all Non-Parties, including but not limited to FLORIDA, shall become null and void as to all Non-Parties only, but shall remain in full force and effect as to NOAA and PETER HALMOS AND AFFILIATES. PETER HALMOS AND AFFILIATES hereby expressly reserve all of their rights, CLAIMS, all other claims, and defenses as to each Non-Party, including, but not limited to, any CLAIM, and all other claims, for conspiracy or collusion, as if this AGREEMENT did not exist. Moreover, as to any such Non-Party, PETER HALMOS AND AFFILIATES expressly deny any waiver whatsoever and no waiver can be implied or construed. The PARTIES acknowledge and agree that time is of the essence.

PROVISIONS OF THIS AGREEMENT ARE SPECIFICALLY INTENDED TO OPERATE AND BE IRREVOCABLY IN FULL FORCE AND EFFECT EVEN IF IT IS ALLEGED, CHARGED OR PROVEN THAT SOME OR ALL OF THE CLAIMS RELEASED OR ASSIGNED ARE SOLELY AND COMPLETELY OR PARTIALLY CAUSED BY THE NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE, BREACH OF WARRANTY, VIOLATION OF STATUTE OR COMMON LAW, OR CONDUCT OF ANY TYPE BY ANY PARTY EXCEPT AS OTHERWISE STATED IN THE RELEASE OR ASSIGNMENT ITSELF AND IN THIS AGREEMENT.

     4.6    Consistent with the above Paragraph 4.5, the PARTIES expressly waive the benefits of any law, howsoever denominated, which provides, or could be interpreted or construed as providing, substantially as follows:

     A GENERAL RELEASE OR ASSIGNMENT DOES NOT EXTEND TO CLAIMS WHICH THE RELEASOR OR ASSIGNOR DOES NOT KNOW OR SUSPECT TO EXIST IN

     6   Initials: Peter Halmos _____ ; NOAA _____

HIS/HER/ITS FAVOR AT THE TIME HE/SHE/IT IS EXECUTING THE RELEASE OR ASSIGNMENT WHICH, IF KNOWN TO HIM/HER/IT, MUST HAVE MATERIALLY AFFECTED HIS/HER/ITS' RELEASE OR ASSIGNMENT.

4.7    The PARTIES acknowledge, represent, warrant, and agree that the releases or assignments stated above are full, general, irrevocable and unconditional releases or assignments that are presently effective upon the execution of this AGREEMENT by the PARTIES, subject to the provisions of Paragraphs 4.1 and 4.4 above. The PARTIES expressly waive and assume the risk of any and all CLAIMS that exist as of this date, including those that they do not know or suspect exist (whether through ignorance, oversight, error, negligence or otherwise) and which, if known, would materially affect their decision to enter into this AGREEMENT. This AGREEMENT and the included releases and assignments are limited to CLAIMS that were or could have been asserted as of and prior to the date of this AGREEMENT and which could be directly or indirectly asserted in the future arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, and shall not directly or indirectly release, restrict or adversely affect any rights, claims, liens, demands, damages, penalties, or causes of action of every nature and kind that the PARTIES may have now or in the future against the other PARTIES and/or any third party that are unrelated to the Subject Matter of this AGREEMENT.

4.8    Should any PARTY breach this AGREEMENT by directly or indirectly asserting any CLAIM released or assigned by that PARTY herein against any other PARTY, and/or in any way instituting indirectly what is prohibited by this AGREEMENT from being done directly, then the release or assignment provided by the PARTY against whom such a CLAIM is asserted or in any manner enforced shall become null and void and of no benefit to the PARTY asserting such CLAIM. The release or assignment of the PARTY wrongfully so doing shall remain valid and in full force and effect and may be asserted as a defense to such CLAIM by the PARTY against whom the wrongful CLAIM is brought. In such event, the breaching PARTY shall be liable for damages, injuries, costs and expenses, including reasonable attorneys, experts, researchers, consultants, investigators, and advisors fees, through all available appeal, to the non-breaching party to be determined in a lawful tribunal by a constitutionally constituted jury applying a "preponderance of the evidence" standard of proof.

4.9    PETER HALMOS AND AFFILIATES have no direct or indirect duty, obligation and/or undertaking arising from, relating to and/or concerning the Subject Matter of this AGREEMENT other than as clearly, concisely and expressly stated in this AGREEMENT.

**5.     Covenant Not to Sue**

5.1    The GOVERNMENTAL ENTITIES unconditionally, fully, irrevocably and finally agree and covenant forever not to instigate, bring or sponsor any administrative and/or enforcement actions, complaint, suit, legal, equitable and/or any other proceeding and course of conduct, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against PETER HALMOS AND AFFILIATES, any GOVERNMENTAL CLAIMS that have been released, or agreed to be released herein, and/or assigned or agreed to be assigned herein, and/or any other matter of every nature and kind that is or may be construed to be adverse to PETER HALMOS AND

7    Initials: Peter Halmos _____ ; NOAA _____

AFFILIATES, arising directly or indirectly from, relating to or having any connection with the Subject Matter of this AGREEMENT. The GOVERNMENTAL ENTITIES further unconditionally, fully, irrevocably and finally agree and covenant forever not to directly or indirectly cause, instigate and/or encourage any other person or entity to engage in such above-referenced conduct including to file, prosecute, commence, institute or continue any administrative enforcement actions, complaint, suit, legal or equitable proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against PETER HALMOS AND AFFILIATES, any matter of any and every kind and nature whatsoever, whether known or unknown, and whenever or however occurring, arising directly or indirectly from or having any direct or indirect connection with the Subject Matter of this AGREEMENT.

5.2     Subject to the provisions of Paragraph 4.4 above, PETER HALMOS unconditionally, fully, irrevocably and finally agrees and covenants forever not to instigate, bring or sponsor any complaint, suit, legal or equitable proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against any GOVERNMENTAL ENTITY, any PETER HALMOS CLAIMS that have been released, or agreed to be released herein, arising directly or indirectly from or having any connection with the Subject Matter of this AGREEMENT. PETER HALMOS, subject to the provisions of Paragraph 4.4 above, further unconditionally, fully, irrevocably and finally agrees and covenants forever not to directly or indirectly cause, instigate or encourage any other person or entity to file, prosecute, commence, institute or continue any complaint, suit, legal or equitable proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against any GOVERNMENTAL ENTITY, any matter of any and every kind and nature whatsoever, whether known or unknown, and whenever or however occurring, arising directly or indirectly from or having any direct or indirect connection with the Subject Matter of this AGREEMENT.

5.3     Notwithstanding any other provision of this AGREEMENT, the PARTIES shall retain the right to sue to enforce their rights pursuant to and the obligations created by this AGREEMENT. Any such action may include a recovery for damages for any breach of this AGREEMENT, and any other remedy available to the PARTY at law or in equity. In such event, the action will be adjudicated by a lawful tribunal with all issues determinable by a constitutionally constituted jury using a "preponderance of the evidence" standard of proof as to enforceability, damages, injuries, and other relief not expressly prohibited by law. The prevailing PARTY will be awarded reasonable attorney's fees and costs including, but not limited to, experts, researchers, consultants, investigators, and advisors fees through all available appeal.

6.     **Cooperation**

6.1     Should any Non-Party at any time assert any claim or bring any action against one of the PARTIES herein and/or should any of the PARTIES assert any claim or bring any action against a Non-Party directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, the other PARTIES shall cooperate with the PARTY against or by whom such a claim is asserted or action brought, to the maximum extent not expressly prohibited by law, to defend against such claim or action and to seek any and all lawful redress against any Non-Party that is not expressly prohibited by law. NOAA and PETER

8     Initials: Peter Halmos _____; NOAA _____

HALMOS will cooperate in all respects to effectuate the purposes and performance specified in this Agreement.

      6.2    The GOVERNMENTAL ENTITIES agree not to, directly or indirectly through one or more intermediaries, intentionally provide any compensation, benefits, material non-public information concerning PETER HALMOS AND AFFILIATES, assistance and/or cooperation to any Non-Party who at any time now and/or in the future asserts any allegation, claim and/or adverse conduct against or toward PETER HALMOS AND AFFILIATES, and/or against whom PETER HALMOS AND AFFILIATES asserts any claim and/or allegations, directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, in any threatened, pending or future event, course of conduct and/or proceeding of every nature or kind, except to the extent required by law or legal process; and in such instance only after ten (10) days advance written notice to PETER HALMOS AND AFFILIATES of such proposed action (unless a shorter period is ordered by a lawful tribunal) and only after that GOVERNMENTAL ENTITY'S counsel has concluded that such action is required by law and the requested information and/or other legal process is disclosed to PETER HALMOS AND AFFILIATES at such time and manner whereby PETER HALMOS AND AFFILIATES'S due process rights are fully protected. The GOVERNMENTAL ENTITIES further agree that they will not directly or indirectly contact or encourage any taxing, enforcement or regulatory agencies and personnel to investigate, audit, take administrative action against, sue, or otherwise assert any claim and/or action against PETER HALMOS AND AFFILIATES.

    7.    **Additional Representations and Warranties**

The PARTIES agree, represent, and warrant:

      7.1    That the consideration specified in this AGREEMENT is the sole consideration for its execution and performance and is made by or on behalf of the PARTIES in full payment and irrevocable satisfaction or assignment of all CLAIMS;

      7.2    That no promise or representation or inducement of any kind has been made, except as expressly stated in this AGREEMENT;

      7.3    That the PARTIES are legally and mentally competent to sign and perform this AGREEMENT; that the PARTIES have been represented and advised by counsel of their choice in connection with this AGREEMENT; that this AGREEMENT was negotiated at arm's length; that the respective persons executing this AGREEMENT are duly authorized and empowered to bind any person and entity for which they have signed below; and that such persons possess all requisite consents, approvals, and authorizations to execute, deliver and perform this AGREEMENT in all capacities stated herein;

      7.4    That the PARTIES to this AGREEMENT were represented by counsel and this document was negotiated by counsel and no party may rely on any drafts of this AGREEMENT in any interpretation of this AGREEMENT. Each PARTY and counsel for each PARTY to this AGREEMENT has reviewed this AGREEMENT and, accordingly, no party shall

    9   Initials: Peter Halmos _____ ; NOAA _____

attempt to invoke the rule of construction to the effect that ambiguities are to be resolved against the drafting party in any interpretation of this AGREEMENT.

7.5     This AGREEMENT is not intended, and shall not be, directly or indirectly construed as an admission of liability, fault, mistake or wrongdoing by any PARTY, each of whom specifically deny any liability, fault, or wrongdoing, but instead reflects a binding and irrevocable settlement and accord and satisfaction of contested and disputed matters, by which the PARTIES have forever bought their peace.

7.6     The PARTIES herein presently own one hundred percent (100%) of the CLAIMS each released or assigned by this AGREEMENT, and no other person, entity or agency owns any interest therein, by assignment, subrogation, statute, or otherwise; that the PARTIES have not in any way assigned or otherwise transferred to any other person or entity any interest in the CLAIMS released or assigned by this AGREEMENT; and that the PARTIES possess the exclusive right to receive all of the consideration and benefits made for this AGREEMENT.

7.7     The GOVERNMENTAL ENTITIES warrant that they have no other claims, rights, benefits, opportunities, allegations, defenses, and/or causes of action, arising by statute, under common law or equity, or otherwise upon any bases whatsoever against PETER HALMOS AND AFFILIATES, arising from, relating to and/or in any way concerning the Subject Matter of this AGREEMENT other than those released or assigned herein.

7.8     NOAA represents, warrants and stipulates that PETER HALMOS AND AFFILIATES are not directly or indirectly liable for any GOVERNMENTAL CLAIMS, or any alleged damages or injuries as more comprehensively described herein that could have been asserted or may now and in the future be asserted arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, including any salvage effort to remove S/Y *Legacy* to from the SANCTUARY.   Furthermore, NOAA acknowledges and stipulates that the compensation provided for in this AGREEMENT constitutes full and final payment and compensation for any and all alleged damage, destruction or loss of, or injury as more comprehensively described herein to, the seabed, seagrasses and/or any SANCTUARY resources, that may have resulted from the Subject Matter of this AGREEMENT.

**8.     Merger**

This AGREEMENT constitutes the sole and entire agreement by, between and among the PARTIES arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, and may not be modified, amended, waived, or terminated except by a written agreement signed by all PARTIES, and such modification, amendment, waiver or termination, if made, may be made with or without additional consideration. This AGREEMENT supersedes any and all prior and/or contemporaneous agreement(s), correspondence, understanding or undertaking, written or oral, by and between or among the PARTIES or their counsel arising from, relating to and/or concerning the Subject Matter of this AGREEMENT.  No prior draft of this AGREEMENT, or any prior or contemporaneous negotiations, correspondence, or proceedings in connection with this AGREEMENT, shall be offered or received as evidence concerning the interpretation or construction of this AGREEMENT.  This AGREEMENT is separate and independent of the agreement between NOAA and IYC entered into at or near the same time as this AGREEMENT.

**9.     Severability**

10    Initials: Peter Halmos _____ ; NOAA _____

It is understood and agreed that if any one or more of the provisions or part of any provision contained in this AGREEMENT shall be held by a lawfully constituted tribunal having jurisdiction to be unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision, and this AGREEMENT shall be construed as if such invalid or unenforceable provision did not exist. The PARTIES acknowledge and agree that if any provision or part of any provision of this AGREEMENT shall for any reason be determined or deemed to be unenforceable as written, such provision shall be construed in a manner so as to render it enforceable in the manner intended. Each PARTY will take all reasonable actions to assure all PARTIES receive the benefits of this AGREEMENT, unconditionally and irrevocably, and of their bargain represented by the letter of this AGREEMENT.

### 10. Non-Waiver of Breach

The failure of a PARTY to this AGREEMENT to insist upon strict adherence to any term of this AGREEMENT on any occasion shall not be considered a waiver or deprive that PARTY of the right thereafter to require strict adherence to that term or any other term of this AGREEMENT. The waiver by any PARTY of any breach of any provision of this AGREEMENT shall not constitute or operate as a waiver of any breach of any other provision hereof, or as a continuing waiver of any breach, nor shall failure to enforce any provision hereof operate as waiver at such time or at any future time of performance of any other provisions hereof. Any waiver must be evidenced in writing and duly executed in writing by the PARTY against whom such waiver may be enforced.

### 11. Indirect Actions

Each of the PARTIES agrees from and after the date they duly execute this AGREEMENT not to take or cause to be taken indirectly any action which each PARTY is prohibited to take or cause to be taken directly, under this AGREEMENT and the Subject Matter of this AGREEMENT.

### 12. Expenses

Each of the PARTIES shall pay all of its own expenses relating to the investigation, negotiation, execution and performance of this AGREEMENT and the Subject Matter of this AGREEMENT, including the fees and expenses of its own financial, legal, technical and tax advisors.

### 13. Specific Performance

The PARTIES acknowledge and agree that each would be irreparably damaged in the event that any of the provisions of this AGREEMENT are not fully and strictly performed in accordance with their specific terms or are otherwise breached. It is accordingly hereby agreed that each PARTY shall be entitled to seek an injunction (or injunctions) to prevent breaches of this AGREEMENT by any other PARTY hereto and to specifically enforce this AGREEMENT and the terms and provisions thereof against any other PARTY hereto. The selection of Specific Performance as a requested remedy in no way waives any right to any other remedy that may be available to that PARTY at law or in equity or otherwise.

### 14. Survival of Representations and Warranties

11   Initials: Peter Halmos _____ ; NOAA _____

All stipulations, representations, obligations and warranties shall survive the execution and performance of this AGREEMENT.

**15.   Notice**

Whenever any notice, information, or documentation is required by this AGREEMENT to be given to NOAA, it shall be provided in writing to the following:

Craig R. O'Connor
NOAA Office of General Counsel (Special Counsel)
7600 Sand Point Way NE
Seattle, WA 98115

Whenever any notice, information, or documentation is required by this AGREEMENT to be given to FLORIDA, it shall be provided in writing to the following:

Whenever any notice, information, or documentation is required by this AGREEMENT to be given to PETER HALMOS AND AFFILIATES, it shall be provided in writing by certified mail, return receipt requested, acknowledging delivery to the following:

Peter Halmos
c/o Gail Meyers, C.P.A.
Meyers & Associates
5725 Corporate Way
West Palm Beach, Florida 33407

and

Thomas A. Campbell
Pillsbury, Winthrop, Shaw, Pittman LLP
909 Fannin St., Suite 2000
Houston, Texas 77010

**16.   Miscellaneous**

16.1   This AGREEMENT may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. A faxed or emailed copy of this AGREEMENT shall have the same effect as an original.

16.2   All of the definitions, provisions, terms and language herein are contractual. There are no non-binding recitals.

16.3   All of the terms and conditions contained in this AGREEMENT shall be binding upon and inure to the benefit of the PARTIES, subject to the provisions of Paragraph 4.4 above, and comprehensively without limitation their respective directors, officers, partners, employees, direct or indirect parents and affiliates, shareholders, heirs, subsidiaries, predecessors, successors, and assigns and others such that the PARTIES' rights to receive the

12   Initials: Peter Halmos _____ ; NOAA _____

benefit of their bargain is not or cannot be compromised to the maximum extent not prohibited by law.

16.4   Should it ever be asserted by ACE-INA that any provision of this AGREEMENT is in conflict with, or in any way operates to void or impair any rights and/or benefits pursuant to applicable ACE-INA insurance contracts, such provision, and this AGREEMENT as a whole, shall be interpreted by a court of competent jurisdiction so as to be in accordance with and protect the rights, benefits and enforceability of such ACE-INA insurance contracts. Should such a court in making such an interpretation determine that the assignment of NOAA's claims to PETER HALMOS in any way conflicts with, or operates to void or impair any rights and/or benefits of such ACE-INA insurance contracts, such assignment shall be automatically converted to a full, unconditional and irrevocable release of CLAIMS as provided in this AGREEMENT.

17.   No Additional Beneficiaries

Nothing in this AGREEMENT, express or implied, confers, is intended to confer, or can be construed to confer, directly or indirectly, on any Non-Party (as defined in Paragraphs 1.11 and 4.4 of this AGREEMENT), any rights, remedies, releases, claims, benefits, interest, standing, obligations or liabilities of any nature or kind whatsoever under or by reason of this AGREEMENT.

18.   Representations regarding Execution and Authority

Each person executing this AGREEMENT expressly represents that such person is duly authorized to execute and cause the performance of this AGREEMENT and each such person or entity expressly waives any defense it now has, or in the future may have, with respect to the valid and binding execution of this AGREEMENT by an authorized representative.  Each PARTY is expressly authorized and permitted to rely on each other PARTY that its execution of this AGREEMENT is duly, irrevocably, and without restriction authorized.

EXECUTED this _5_ day of January, 2007.

13   Initials: Peter Halmos _____; NOAA _____

Jan 07 07 07:48p     Craig OConnor         360-293-3250        p.2

NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION
By: _____
Title: _____

STATE OF FLORIDA

By: _____
Title: _____


PETER HALMOS, individually

By: _____
Title: ____ a k a " R o s s P o s s "


14   Initials: Peter Halmos ____; NOAA____

## AGREEMENT AND MUTUAL RELEASE

This Agreement and Mutual Release dated as of January ___5___, 2007, is entered into by, among and between the PARTIES, as defined below.

1.   **Definitions**

The following defined terms shall have the meaning stated:

1.1   The term "AGREEMENT" means this Agreement and Mutual Release.

1.2   The term "Subject Matter of this AGREEMENT" means the grounding of S/Y *Legacy* in the SANCTUARY on or about October 24, 2005, the time S/Y *Legacy* has remained grounded there, and the salvage/recovery/removal operation to remove S/Y *Legacy* from the SANCTUARY.

1.3   The term "IYC" means International Yachting Charters, Inc. ("IYC"), and S/Y *Legacy* and her tenders (*in rem*), including its owner, all officers and crew of S/Y *Legacy*, and all shareholders, directors, officers, employees, agents, partners, partnerships, representatives, subsidiaries, trusts, affiliates, successors and assigns of any of the foregoing including but not limited to any alleged capacity as an operator of S/Y *Legacy*. This does not include Peter Halmos in his non-corporate individual capacity.

1.4   The term "NOAA" means the National Oceanic and Atmospheric Administration. This includes NOAA acting in all of its capacities, including but not limited to that of Natural Resource Trustee and Sanctuary manager for the SANCTUARY.

1.5   The term "FLORIDA" means the State of Florida, including all of its agencies and departments.

1.6   The term "PARTIES" or "PARTY" to this AGREEMENT refers only to IYC, NOAA, and FLORIDA (to the extent that FLORIDA has executed this AGREEMENT), collectively or individually.

1.7   The term "GOVERNMENTAL ENTITIES" means NOAA and FLORIDA, collectively or individually.

1.8   The term "GOVERNMENTAL CLAIMS," when used in relation to a potential claim of the GOVERNMENTAL ENTITIES against IYC, comprehensively means any and all claims, causes of action, allegations, demands, assertions and/or course of conduct of any nature and type whatsoever including for damages, losses, compensation, injuries, response costs, remediation, restoration, loss of use and/or ecological and other services flow, monitoring, repair, evaluation, interest, liens, forfeiture, equitable relief, compensation, benefits, demands, costs and expenses including attorneys' fees (and expenses for experts, consultants, advisors, government employees and resources) and any other relief, and comprehensively includes, but is not limited to, damages and response costs as defined at 16 U.S.C. § 1432, civil penalties, forfeiture and costs (under 16 U.S.C. § 1437), and any damages, response costs and interest under 16 U.S.C. § 1443, pursuant to the National Marine Sanctuary Act (16 U.S.C. §§ 1431 *et*

Initials: IYC ___ ; NOAA ___

*seq*), the Florida Keys National Marine Sanctuary and Protection Act (104 Stat. 3089) and/or the implementing regulations promulgated pursuant thereto (15 C.F.R. Part 922), whether direct or indirect of every nature and kind whatsoever, without restriction or limitation including natural resources, marine, avian and all other organisms, whether living or dead, including flora and fauna of every nature and kind, environment, ecosystem, habitat, and whether known or unknown, arising from any asserted ownership or trusteeship pertaining to the SANCTUARY seabed and/or sanctuary resources, as defined in the National Marine Sanctuary Act at 16 U.S.C. § 1432(8), and/or arising from any other direct or indirect assertion of right, authority, custom, treaty, protocol, and all other bases whether lawful or unlawful which now and in the future may exist by any of the GOVERNMENTAL ENTITIES, arising from or relating in any way to the Subject Matter of this AGREEMENT.

1.9     The term "IYC CLAIMS," when used in relation to a potential claim of IYC against the GOVERNMENTAL ENTITIES, means any and all claims for damages directly or indirectly resulting from any alleged taking, violation of Fifth Amendment due process rights, delay, and loss of use of S/Y *Legacy*, and comprehensively includes, but is not limited to, all causes of action, all claims for compensation or benefits, demands, damages (including without limitation claims for attorney's fees or expenses, and any claims for expert or consultant fees or expenses), arising from or relating in any way to the Subject Matter of this AGREEMENT.

1.10     The term "CLAIMS" means the aggregation of GOVERNMENTAL CLAIMS and IYC CLAIMS.

1.11     The term "ACE-INA" means the Insurance Company of North America. ACE-INA is a Non-Party to this AGREEMENT.

1.12     The term "SANCTUARY" means the Florida Keys National Marine Sanctuary.

2.     **Averments**

IYC is in possession of certain facts pertaining to the Subject Matter of this AGREEMENT. In relevant part, certain key facts are stated in this Section 2. NOAA has made an independent inquiry with IYC'S full cooperation, and has found no basis to dispute them.

2.1     S/Y *Legacy* is a 158' luxury sailing yacht. S/Y *Legacy*'s maximum design speed is approximately 13.5 knots in ideal weather conditions and clean hull, with half its fuel capacity. S/Y *Legacy*'s design cruising speed under these same ideal conditions is approximately 10 knots.

2.2     As of 11:00 p.m. EDT, Friday, October 21, 2005, "extremely dangerous Hurricane Wilma" was located along the Yucatan Peninsula 325 nautical miles southwest of Key West, Florida. It remained in that general vicinity until approximately 5:00 a.m. EDT, Sunday, October 23, 2005, at which time it began moving east toward the Gulf of Mexico and Florida at an accelerating speed. NOAA located Wilma 305 miles from Key West with Gulf of Mexico and Florida Atlantic seas already 6 – 12 feet. Just 12 hours later, NOAA located Wilma 210 miles from Key West with accelerating forward speed, reporting Gulf of Mexico and Florida Atlantic seas of 15 – 25 feet. Concurrently, NOAA located Tropical Storm Alpha near the

2                         Initials: IYC _____ ; NOAA _____

eastern end of Cuba moving north-northeast toward Miami at about 15 mph, reporting 12-foot seas.

2.3     Six hours later, at 11:00 p.m. EDT, Sunday, October 23, NOAA located Wilma 120 miles from Key West with forward speed of about 20 mph causing 15 – 25 foot seas. At the same time, NOAA reported Alpha's forward speed toward Miami had increased to about 18 mph resulting in winds of about 50 mph and seas 12 – 15 feet. NOAA predicted Alpha to collide with and be "absorbed" by Wilma in the vicinity of Florida. By 5:00 a.m. EDT, Monday, October 24, NOAA located Wilma's eye just 65 miles north-northwest of Key West with 20 mph forward speed.

2.4     At the time that Hurricane Wilma was along the Yucatan Peninsula on October 21, S/Y *Legacy* had taken reasonable and necessary precautions including refueling for full tanks (10,000 gallons) essential for avoiding Wilma.

2.5     When NOAA reported Hurricane Wilma was "extremely dangerous" and moving from the Yucatan toward Florida, S/Y *Legacy* had three options: (1) running offshore to try to avoid the hurricane, and if not able to avoid it, to try to ride it out at sea; (2) go to a dock, tie up, and remove all persons from the boat for them to seek shelter; or (3) anchor in an appropriate "hurricane hole."

2.6     S/Y *Legacy* could not hope to outrun Wilma by going east. Wilma was approaching much faster than S/Y *Legacy* could travel in 6 – 12 foot seas, building to 15 – 25 feet, and would certainly overtake her. Any attempt to outmaneuver the hurricane contained a great risk that the hurricane would trap the boat in the open sea where, combined with 15 – 25 foot seas, S/Y *Legacy* would likely capsize. To the north, S/Y *Legacy* would have been trapped in the Gulf of Mexico by the panhandle and peninsula coasts of Florida. To the south, Tropical Storm Alpha was rapidly heading toward Miami pushing 12 foot seas. NOAA predicted Wilma and Alpha would collide with Wilma absorbing Alpha to become even stronger. Therefore, going south to try to avoid Wilma was not an option for S/Y *Legacy*.

2.7     The captain and owner of S/Y *Legacy* were keenly aware and influenced by the fate of the commercial sailing vessel *Fantome* in 1998, among others. The *Fantome* was a 282' steel hulled vessel, much larger and more formidable than S/Y *Legacy*. The captain and crew of the *Fantome* tried to run offshore to avoid Hurricane Mitch. They tried without success to guess which direction that hurricane was going. Unable to outrun or outmaneuver the hurricane, the *Fantome* became trapped between the hurricane and the coasts of Honduras and Belize. The attempt to then ride out the storm at sea resulted in the total loss of the vessel and all 31 crew members. S/Y *Legacy* cannot survive 15 – 25 foot seas in a hurricane, nor the 35 – 45 foot seas likely when Alpha collided with Wilma. Evading Wilma was not an option.

2.8     Docking was also not an option. Most commercial docks are not designed for a sailboat of S/Y *Legacy's* shape, with its curved sides. Even if a dock were available, the storm surge could cause S/Y *Legacy* to destroy the dock and/or cause a rupture of her fuel tanks. The dangers from pilings and other vessels would have required S/Y *Legacy's* crew to abandon S/Y *Legacy* until the hurricane passed, dooming S/Y *Legacy* because the changing wind direction and tidal surges require constant adjusting of lines.

3                          Initials: IYC _____ ; NOAA _____

2.9   As one of the reasonably necessary precautions taken by S/Y *Legacy*, a sheltered "hurricane hole" had been selected in the event severe weather necessitated. In this location, shallow tidal flats and nearby islands provided protection from the 15 – 25 foot seas raging offshore in the Atlantic and Gulf of Mexico. Throughout the complete time period that Hurricane Wilma was in the vicinity of S/Y *Legacy*, the full compliment of the crew was present and aboard S/Y *Legacy* in order to be able to respond to the changing conditions and circumstances presented by Hurricane Wilma.

2.10   S/Y *Legacy's* "hurricane hole" near marker 15 in the main northwest navigation channel connecting the Atlantic and Gulf of Mexico has ample water depth to allow S/Y *Legacy* to rotate 360 degrees into the wind at all times while the tidal flats, barrier reefs and islands minimized the wave hikes from the wind and storm surge. This location also minimized the risk of collision with other vessels that inevitably break their moorings.

2.11   S/Y *Legacy* put out 400' of rode for the main anchors. This amounted to a 14:1 ratio of rode to depth. The standard for anchoring with a storm approaching is 10:1. A third anchor with 600' of line was deployed equidistant between the two main anchors.

2.12   S/Y *Legacy* was positioned at anchor so as to face into the wind and to allow for 360 degrees of movement as the wind direction changed.

2.13   Throughout the whole time period involving Hurricane Wilma, all persons, entities, and interests defined herein under the term IYC, and all others if not expressly identified, were not guilty of any unreasonable omission, to prevent the grounding of S/Y *Legacy* before and during the onslaught of Hurricane Wilma, and to minimize any alleged damage to the SANCTUARY and all natural resources as a result thereof and thereafter.

2.14   Fas Dam has represented to the PARTIES that it can be staged to perform the salvage/recovery/removal operations of Exhibit "A" within seven to twelve days after IYC executes a contract with Fas Dam and Fas Dam is in receipt of the down payment in accordance with Exhibit "A". Fas Dam estimates it can have the salvage/removal/recovery operation completed within sixty (60) days subject to conditions and occurrences not under its control such as weather, strikes, terrorism, and other such interferences.

3.   **Mutual Stipulations**

The PARTIES hereby stipulate:

3.1   That on or about October 24, 2005, S/Y *Legacy* was involuntarily, unintentionally, and of necessity forced aground in the SANCTUARY by, during, and as a result of Hurricane Wilma.

3.2   That all persons, entities, and interests defined herein under the term IYC, and all others if not expressly identified, did what was reasonably necessary and prudent while acting with due care and in good faith after taking reasonable and necessary precautions to prevent the grounding of S/Y *Legacy* before and during the onslaught of Hurricane Wilma, and to minimize any alleged damage to the SANCTUARY and all natural resources as a result thereof and thereafter.

4                    Initials: IYC _____ ; NOAA _____

3.3    That as a result of the Subject Matter of this Agreement, IYC alleges certain CLAIMS against the GOVERNMENTAL ENTITIES, and some or all of the GOVERNMENTAL ENTITIES allege certain CLAIMS against IYC.

3.4    That S/Y *Legacy* is and has been aground at its original grounded location within the SANCTUARY and all PARTIES desire to move forward with recovery of S/Y *Legacy* from the SANCTUARY as expeditiously as possible.

3.5    That all PARTIES deny the alleged CLAIMS.

3.6    That all PARTIES desire and intend hereby to avoid the further expense, inconvenience, and uncertainty of protracted litigation, and to settle all disputes, controversies and CLAIMS, whether asserted or unasserted, by and between the PARTIES, directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT in the manner and upon the terms and conditions set forth in this AGREEMENT so as to irrevocably, finally and without further recourse settle, release, compromise, and discharge fully all CLAIMS of all PARTIES against the other PARTIES, and by which the PARTIES are forever buying their peace.

3.7    That each PARTY has conducted sufficient due diligence to enable it to irrevocably enter into this AGREEMENT, and to confirm as accurate and true these Stipulations.

4.    **Consideration**

In consideration of the mutual releases and other provisions of this AGREEMENT, and other good and valuable consideration as set forth herein, including but not limited to the release of such IYC CLAIMS, and the placing of the money in escrow as security for the payment obligations of IYC as set forth below, all of which constitute good and valuable consideration, the sufficiency of which is hereby acknowledged, each PARTY releases each other PARTY(s) of any and all CLAIMS pursuant to this AGREEMENT:

4.1    The GOVERNMENTAL ENTITIES hereby release any and all of their rights, defenses and CLAIMS against IYC, as of the date of their execution of this AGREEMENT as more comprehensively defined in Paragraph 4.8 below. NOAA will cooperate with IYC to get S/Y Legacy to Open Water.

4.2    IYC hereby releases all of its rights, defenses and CLAIMS against the GOVERNMENTAL ENTITIES as of the date IYC and NOAA duly execute this AGREEMENT as more comprehensively defined in Paragraph 4.8 below, and as qualified in Paragraph 4.5 below. Nothing herein releases any claims that IYC may have against all Non-Parties, and IYC hereby expressly reserves all of its rights, claims, and defenses as to all Non-Parties.

4.3    NOAA approved Fas Dam as the salvor and Fas Dam's salvage plan attached as Exhibit "A" and for all purposes incorporated herein. Within approximately four business days of execution by IYC and NOAA of this AGREEMENT, IYC will deposit Seven Hundred Fifty Thousand Dollars ($750,000.00) in cash, in escrow to cover estimated costs under the contract with Fas Dam with authorization for the Escrow Agent to pay Fas Dam, or other salvors as set forth in this paragraph, pursuant to the contract between Fas Dam and IYC

5        Initials: IYC _____ ; NOAA _____

attached as Exhibit "A", or pursuant to a contract between other salvors and IYC. Additionally, as amounts are paid out by the Escrow Agent for the costs under the contract with Fas Dam or other salvors as set forth in this paragraph, documentation thereof shall be submitted by the Escrow Agent to IYC's insurance company, ACE-INA, for reimbursement.  All such reimbursement payments shall be deposited in escrow to maintain the balance within the escrow account.  Until the termination of the escrow account in accordance with this paragraph, should the balance in the escrow account reach Two Hundred Thousand Dollars ($200,000.00) or below, IYC shall deposit sufficient funds in escrow to bring the balance of the escrow account back up to Seven Hundred Fifty Thousand Dollars ($750,000.00).  Additionally, on the first day of each month after the escrow account is established, if the escrow account balance is below Seven Hundred Fifty Thousand Dollars ($750,000.00), IYC shall deposit sufficient funds in escrow to bring the balance of the escrow account back up to Seven Hundred Fifty Thousand Dollars ($750,000.00).  However, in no case shall the obligation of IYC to deposit funds into escrow, in full satisfaction of IYC's obligations pursuant to this Agreement, beyond that which is reimbursed by ACE-INA, exceed One Million, Two Hundred Fifty Thousand Dollars ($1,250,000.00).  The funds deposited into escrow pursuant to this paragraph may only be utilized by the Escrow Agent to pay such costs for the recovery/removal/salvage of the S/Y *Legacy* as set forth in this AGREEMENT and the contract with Fas Dam or any other salvor, as such costs may come due pursuant to such salvage charges contract, and for no other purpose whatsoever.  NOAA will cooperate with IYC to get S/Y Legacy to Open Water.

If during Fas Dam's execution of the salvage plan in Exhibit "A" it is determined by Fas Dam and/or IYC that Fas Dam is unable to remove S/Y *Legacy* to Open Water pursuant to Exhibit "A," IYC will within a reasonable time enter into a "no cure, no pay," fixed price salvage charges contract with Blue Water Marine pursuant to Blue Water's salvage plan attached as Exhibit "B", or with such other suitable salvor, acceptable to NOAA, acceptance by NOAA not to be unreasonably withheld, as IYC may obtain.

If the above referenced salvors are unsuccessful in delivering S/Y Legacy to Open Water, NOAA shall enter into a fixed price "no cure no pay" salvage charges contract with another non-FEMA sponsored salvor acceptable to IYC, acceptance by IYC not to be unreasonably withheld, to remove S/Y *Legacy* to Open Water. NOAA may access the remaining funds held by the escrow agent, which is authorized to make such payments on behalf of IYC as may come due pursuant to such contract, and for no other purpose whatsoever.

The PARTIES hereto agree and stipulate that the Seven Hundred Fifty Thousand Dollars ($750,000.00) initially deposited into escrow in accordance with this Paragraph, and all subsequent deposits, as set forth above are IYC's assets. Once S/Y *Legacy* reaches Open Water, whatever amount of the escrow account has not been used to pay the validly owed salvage charges for the removal of S/Y *Legacy* to Open Water, and remain in escrow, including any reimbursements received from ACE-INA, shall then be released. At that time, the escrow agent is authorized to, and must, refund such remaining amount to IYC.

Nothing pertaining to the provisions of this Paragraph shall ever be utilized by any PARTY to assert a conflict of interest or otherwise attempt to disqualify Thomas Campbell and/or the firm of Pillsbury Winthrop Shaw Pittman, LLP, from representing IYC or any individuals related to it, including but not limited to Peter Halmos. The PARTIES, by their

6                Initials: IYC ____; NOAA ____

execution of this AGREEMENT, hereby waive any conflict of interest pertaining to Thomas Campbell and/or the firm of Pillsbury Winthrop Shaw Pittman, LLP, as pertains to their representation of IYC or any individuals related to it, including but not limited to Peter Halmos.

4.4    NOAA has been made a third party beneficiary of the salvage charges contract at Exhibit "A" and IYC will use its best efforts to cause NOAA to be made a third party beneficiary of any subsequent salvage charges contract(s), if any, and NOAA shall have all rights that accrue with such standing.

4.5    This AGREEMENT, and all consideration and benefits provided for herein, shall be binding and in full force and effect upon the signature of both IYC and NOAA, if duly executed by IYC and NOAA no later than midnight p.m. EST January _2_, 2007. Should FLORIDA not execute this AGREEMENT (herein any non-signatory is referred to as a "Non-Party") no later than January 31, 2007, the release contained in Paragraph 4.2 above, this AGREEMENT, and any and all other alleged restriction or adverse affect to IYC'S rights, claims and defenses against all Non-Parties, including but not limited to FLORIDA, shall become null and void as to all Non-Parties only, but shall remain in full force and effect as to NOAA and IYC. IYC hereby expressly reserves all of its rights, CLAIMS, all other claims, and defenses as to each Non-Party, including, but not limited to, any CLAIM, and all other claims, for conspiracy or collusion, as if this AGREEMENT did not exist. Moreover, as to any such Non-Party, IYC expressly denies any waiver whatsoever and no waiver can be implied or construed. The PARTIES acknowledge and agree that time is of the essence.

4.6    THE RELEASES ABOVE AND THE OTHER PROVISIONS OF THIS AGREEMENT ARE SPECIFICALLY INTENDED TO OPERATE AND BE IRREVOCABLY IN FULL FORCE AND EFFECT EVEN IF IT IS ALLEGED, CHARGED OR PROVEN THAT SOME OR ALL OF THE CLAIMS RELEASED ARE SOLELY AND COMPLETELY OR PARTIALLY CAUSED BY THE NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE, BREACH OF WARRANTY, VIOLATION OF STATUTE OR COMMON LAW, OR CONDUCT OF ANY TYPE BY ANY PARTY EXCEPT AS OTHERWISE STATED IN THE RELEASE ITSELF AND IN THIS AGREEMENT.

4.7    Consistent with the above Paragraph 4.6, the PARTIES expressly waive the benefits of any law, howsoever denominated, which provides, or could be interpreted or construed as providing, substantially as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS/HER/ITS FAVOR AT THE TIME HE/SHE/IT IS EXECUTING THE RELEASE WHICH, IF KNOWN TO HIM/HER/IT, MUST HAVE MATERIALLY AFFECTED HIS/HER/ITS' RELEASE.

4.8    The PARTIES acknowledge, represent, warrant, and agree that the releases stated above are full, general, irrevocable and unconditional releases that are presently effective upon the execution of this AGREEMENT by the PARTIES, subject to the provisions of Paragraph 4.5 above.  The PARTIES expressly waive and assume the risk of any and all

7          Initials: IYC _____ ; NOAA _____

CLAIMS that exist as of this date, including those that they do not know or suspect exist (whether through ignorance, oversight, error, negligence or otherwise) and which, if known, would materially affect their decision to enter into this AGREEMENT. This AGREEMENT and the included releases are limited to CLAIMS that were or could have been asserted as of and prior to the date of this AGREEMENT and which could be directly or indirectly asserted in the future arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, and shall not directly or indirectly release, restrict or adversely affect any rights, claims, liens, demands, damages, penalties, or causes of action of every nature and kind that the PARTIES may have now or in the future against the other PARTIES and/or any third party that are unrelated to the Subject Matter of this AGREEMENT.

4.9 Should any PARTY breach this AGREEMENT by directly or indirectly asserting any CLAIM released by that PARTY herein against any other PARTY, and/or in any way instituting indirectly what is prohibited by this AGREEMENT from being done directly, then the release provided by the PARTY against whom such a CLAIM is asserted or in any manner enforced shall become null and void and of no benefit to the PARTY asserting such CLAIM. The release of the PARTY wrongfully so doing shall remain valid and in full force and effect and may be asserted as a defense to such CLAIM by the PARTY against whom the wrongful CLAIM is brought. In such event, the breaching PARTY shall be liable for damages, injuries, costs and expenses, including reasonable attorneys, experts, researchers, consultants, investigators, and advisors fees, through all available appeal, to the non-breaching party to be determined in a lawful tribunal by a constitutionally constituted jury applying a "preponderance of the evidence" standard of proof.

4.10 Other than for IYC to pay for the salvage charges referenced above in Paragraph 4.3, IYC has no direct or indirect duty, obligation and/or undertaking arising from, relating to and/or concerning the Subject Matter of this AGREEMENT other than as clearly, concisely and expressly stated in the AGREEMENT.

4.11 IYC agrees to pay for insurance coverage up to a policy limit of $2,000,000 per occurrence, $3,000,000 aggregate, at a cost not to exceed $25,000, to be obtained by Fas Dam if reasonably attainable for the Exhibit "A" salvage/recovery/removal operations covering catastrophic damages to SANCTUARY natural resources that may be caused by said operations, and will have NOAA as a beneficiary in said insurance contract.

5. **Covenant Not to Sue**

5.1 The GOVERNMENTAL ENTITIES unconditionally, fully, irrevocably and finally agree and covenant forever not to instigate, bring or sponsor any administrative and/or enforcement actions, complaint, suit, legal, equitable and/or any other proceeding and course of conduct, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against IYC, any GOVERNMENTAL CLAIMS that have been released, or agreed to be released herein, and/or any other matter of every nature and kind that is or may be construed to be adverse to IYC, arising directly or indirectly from, relating to or having any connection with the Subject Matter of this AGREEMENT. The GOVERNMENTAL ENTITIES further unconditionally, fully, irrevocably and finally agree and covenant forever not to directly or indirectly cause, instigate and/or encourage any other person or entity to engage in such above-referenced conduct

8                    Initials: IYC ___ ; NOAA ___

including to file, prosecute, commence, institute or continue any administrative enforcement actions, complaint, suit, legal or equitable proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against IYC, any matter of any and every kind and nature whatsoever, whether known or unknown, and whenever or however occurring, arising directly or indirectly from or having any direct or indirect connection with the Subject Matter of this AGREEMENT.

5.2     Subject to the provisions of Paragraph 4.5 above, IYC unconditionally, fully, irrevocably and finally agrees and covenants forever not to instigate, bring or sponsor any complaint, suit, legal or equitable proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against any GOVERNMENTAL ENTITY, any IYC CLAIMS that have been released, or agreed to be released herein, arising directly or indirectly from or having any connection with the Subject Matter of this AGREEMENT. IYC, subject to the provisions of Paragraph 4.5 above, further unconditionally, fully, irrevocably and finally agrees and covenants forever not to directly or indirectly cause, instigate or encourage any other person or entity to file, prosecute, commence, institute or continue any complaint, suit, legal or equitable proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute, against any GOVERNMENTAL ENTITY, any matter of any and every kind and nature whatsoever, whether known or unknown, and whenever or however occurring, arising directly or indirectly from or having any direct or indirect connection with the Subject Matter of this AGREEMENT.

5.3     Notwithstanding any other provision of this AGREEMENT, the PARTIES shall retain the right to sue to enforce their rights pursuant to and the obligations created by this AGREEMENT. Any such action may include a recovery for damages for any breach of this AGREEMENT, and any other remedy available to the PARTY at law or in equity. In such event, the action will be adjudicated by a lawful tribunal with all issues determinable by a constitutionally constituted jury using a "preponderance of the evidence" standard of proof as to enforceability, damages, injuries, and other relief not expressly prohibited by law. The prevailing PARTY will be awarded reasonable attorney's fees and costs including, but not limited to, experts, researchers, consultants, investigators, and advisors fees through all available appeal.

6.     **Cooperation**

6.1     Should any Non-Party at any time assert any claim or bring any action against one of the PARTIES herein and/or should any of the PARTIES assert any claim or bring any action against a Non-Party directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, the other PARTIES shall cooperate with the PARTY against or by whom such a claim is asserted or action brought, to the maximum extent not expressly prohibited by law, to defend against such claim or action and to seek any and all lawful redress against any Non-Party that is not expressly prohibited by law.  NOAA and IYC will cooperate in all respects to effectuate the purposes and performance specified in this Agreement.

6.2     The GOVERNMENTAL ENTITIES agree not to, directly or indirectly through one or more intermediaries, intentionally provide any compensation, benefits, material non-public information concerning IYC, assistance and/or cooperation to any Non-Party who at

9                     Initials: IYC ____; NOAA ____

any time now and/or in the future asserts any allegation, claim and/or adverse conduct against or toward IYC, and/or against whom IYC asserts any claim and/or allegations, directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, in any threatened, pending or future event, course of conduct and/or proceeding of every nature or kind, except to the extent required by law or legal process; and in such instance only after ten (10) days advance written notice to IYC of such proposed action (unless a shorter period is ordered by a lawful tribunal) and only after that GOVERNMENTAL ENTITY'S counsel has concluded that such action is required by law and the requested information and/or other legal process is disclosed to IYC at such time and manner whereby IYC'S due process rights are fully protected. The GOVERNMENTAL ENTITIES further agree that they will not directly or indirectly contact or encourage any taxing, enforcement or regulatory agencies and personnel to investigate, audit, take administrative action against, sue, or otherwise assert any claim and/or action against IYC.

### 7.    Additional Representations and Warranties

The PARTIES agree, represent, and warrant:

7.1     That the consideration specified in this AGREEMENT is the sole consideration for its execution and performance and is made by or on behalf of the PARTIES in full payment and irrevocable satisfaction of all CLAIMS;

7.2     That no promise or representation or inducement of any kind has been made, except as expressly stated in this AGREEMENT;

7.3     That the PARTIES are legally and mentally competent to sign and perform this AGREEMENT; that the PARTIES have been represented and advised by counsel of their choice in connection with this AGREEMENT; that this AGREEMENT was negotiated at arm's length; that the respective persons executing this AGREEMENT are duly authorized and empowered to bind any person and entity for which they have signed below; and that such persons possess all requisite consents, approvals, and authorizations to execute, deliver and perform this AGREEMENT in all capacities stated herein;

7.4     That the PARTIES to this AGREEMENT were represented by counsel and this document was negotiated by counsel and no party may rely on any drafts of this AGREEMENT in any interpretation of this AGREEMENT. Each PARTY and counsel for each PARTY to this AGREEMENT has reviewed this AGREEMENT and, accordingly, no party shall attempt to invoke the rule of construction to the effect that ambiguities are to be resolved against the drafting party in any interpretation of this AGREEMENT.

7.5     This AGREEMENT is not intended, and shall not be, directly or indirectly construed as an admission of liability, fault, mistake or wrongdoing by any PARTY, each of whom specifically deny any liability, fault, or wrongdoing, but instead reflects a binding and irrevocable settlement and accord and satisfaction of contested and disputed matters, by which the PARTIES have forever bought their peace.

7.6     The PARTIES herein presently own one hundred percent (100%) of the CLAIMS each released by this AGREEMENT, and, subject to paragraph 7.8, no other person, entity or agency owns any interest therein, by assignment, subrogation, statute, or otherwise; that

Initials: IYC _____ ; NOAA _____

the PARTIES have not in any way assigned or otherwise transferred to any other person or entity any interest in the CLAIMS released by this AGREEMENT; and that the PARTIES possess the exclusive right to receive all of the consideration and benefits made for this AGREEMENT; the GOVERNMENTAL ENTITIES stipulate their knowledge that IYC is a party to insurance contracts with insurers including ACE-INA.

7.7 The GOVERNMENTAL ENTITIES warrant that they have no other claims, rights, benefits, opportunities, allegations, defenses, and/or causes of action, arising by statute, under common law or equity, or otherwise upon any bases whatsoever against IYC, arising from, relating to and/or in any way concerning the Subject Matter of this AGREEMENT other than those released herein.

7.8 IYC warrants that it has made no assignment or other contract or agreement whereby (except as listed herein) any insurance company, FAS DAM, or any other entity has any subrogation rights or other rights in any potential claims whereby such entity could bring any action against NOAA by, through or under IYC arising from the Subject Matter of this AGREEMENT. Before the execution of this AGREEMENT, ACE-INA made a payment to IYC to reimburse it for payments totaling the same amount made to Wayne Licina and his company American Oceanics, and to FAS DAM. Pursuant to such payments, IYC did execute the assignment attached hereto as Exhibit "C". However, contemporaneously with the execution of this AGREEMENT and attached as Exhibit "D," ACE-INA has executed a release of any potential claims that it might otherwise have against NOAA by, through or under IYC arising from the Subject Matter of this AGREEMENT. If for any reason ACE-INA should fail to execute Exhibit "D", IYC agrees to indemnify NOAA for any claims brought against it by ACE-INA pursuant to the assignment attached hereto as Exhibit "C".

7.9 NOAA represents, warrants and stipulates that IYC is not directly or indirectly liable for any GOVERNMENTAL CLAIMS, or any alleged damages or injuries as more comprehensively described herein that could have been asserted or may now and in the future be asserted arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, including the Fas Dam salvage plan in Exhibit "A" and/or any other salvage effort as detailed in Paragraph 4.3 above, with the sole and exclusive exception being for IYC to reasonably enter into and pay for salvage charges incurred pursuant to such salvage charges contracts sufficient to remove S/Y *Legacy* to Open Water as defined in Paragraph 4.3. Furthermore, NOAA acknowledges and stipulates that the compensation provided for in this AGREEMENT by IYC to NOAA, constitutes full and final payment and compensation for any and all alleged damage, destruction or loss of, or injury as more comprehensively described herein to, the seabed, seagrasses and/or any SANCTUARY resources, that may have resulted from the Subject Matter of this AGREEMENT.

**8. Merger**

This AGREEMENT, including Exhibits hereto, constitutes the sole and entire agreement by, between and among the PARTIES arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, and may not be modified, amended, waived, or terminated except by a written agreement signed by all PARTIES, and such modification, amendment, waiver or termination, if made, may be made with or without additional consideration. This AGREEMENT supersedes any and all prior and/or contemporaneous agreement(s), correspondence, understanding or undertaking, written or oral, by and between or among the PARTIES or their

11                    Initials: IYC _____; NOAA _____

counsel arising from, relating to and/or concerning the Subject Matter of this AGREEMENT. No prior draft of this AGREEMENT, or any prior or contemporaneous negotiations, correspondence, or proceedings in connection with this AGREEMENT, shall be offered or received as evidence concerning the interpretation or construction of this AGREEMENT. This AGREEMENT is separate and independent of the agreement between NOAA and PETER HALMOS entered into at or near the same time as this AGREEMENT.

### 9. Jurisdiction

For the purposes of enforcement of this AGREEMENT only, IYC agrees that the federal court for the Southern District of Florida will have jurisdiction of the parties and this AGREEEMNT. However, by entering into this AGREEMENT, IYC does not acknowledge or agree to the jurisdiction of any GOVERNMENTAL ENTITY, nor any other governmental body and its laws, over IYC, and IYC expressly reserves, and does not waive, any rights, claims and defenses to the assertion of jurisdiction, and all else except as expressly and directly stated herein, by any governmental body, whether under international law or otherwise.

### 10. Severability

It is understood and agreed that if any one or more of the provisions or part of any provision contained in this AGREEMENT shall be held by a lawfully constituted tribunal having jurisdiction to be unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision, and this AGREEMENT shall be construed as if such invalid or unenforceable provision did not exist. The PARTIES acknowledge and agree that if any provision or part of any provision of this AGREEMENT shall for any reason be determined or deemed to be unenforceable as written, such provision shall be construed in a manner so as to render it enforceable in the manner intended. Each PARTY will take all reasonable actions to assure all PARTIES receive the benefits of this AGREEMENT, unconditionally and irrevocably, and of their bargain represented by the letter of this AGREEMENT.

### 11. Non-Waiver of Breach

The failure of a PARTY to this AGREEMENT to insist upon strict adherence to any term of this AGREEMENT on any occasion shall not be considered a waiver or deprive that PARTY of the right thereafter to require strict adherence to that term or any other term of this AGREEMENT. The waiver by any PARTY of any breach of any provision of this AGREEMENT shall not constitute or operate as a waiver of any breach of any other provision hereof, or as a continuing waiver of any breach, nor shall failure to enforce any provision hereof operate as waiver at such time or at any future time of performance of any other provisions hereof. Any waiver must be evidenced in writing and duly executed in writing by the PARTY against whom such waiver may be enforced.

### 12. Indirect Actions

Each of the PARTIES agrees from and after the date they duly execute this AGREEMENT not to take or cause to be taken indirectly any action which each PARTY is prohibited to take or cause to be taken directly, under this AGREEMENT and the Subject Matter of this AGREEMENT.

12            Initials: IYC _____ ; NOAA _____

**13.   Expenses**

Each of the PARTIES shall pay all of its own expenses relating to the investigation, negotiation, execution and performance of this AGREEMENT and the Subject Matter of this AGREEMENT, including the fees and expenses of its own financial, legal, technical and tax advisors.

**14.   Specific Performance**

The PARTIES acknowledge and agree that each would be irreparably damaged in the event that any of the provisions of this AGREEMENT are not fully and strictly performed in accordance with their specific terms or are otherwise breached. It is accordingly hereby agreed that each PARTY shall be entitled to seek an injunction (or injunctions) to prevent breaches of this AGREEMENT by any other PARTY hereto and to specifically enforce this AGREEMENT and the terms and provisions thereof against any other PARTY hereto. The selection of Specific Performance as a requested remedy in no way waives any right to any other remedy that may be available to that PARTY at law or in equity or otherwise.

**15.   Survival of Representations and Warranties**

All stipulations, representations, obligations and warranties shall survive the execution and performance of this AGREEMENT.

**16.   Notice**

Whenever any notice, information, or documentation is required by this AGREEMENT to be given to NOAA, it shall be provided in writing to the following:

Craig R. O'Connor
NOAA Office of General Counsel (Special Counsel)
7600 Sand Point Way NE
Seattle, WA 98115

Whenever any notice, information, or documentation is required by this AGREEMENT to be given to FLORIDA, it shall be provided in writing to the following:

Whenever any notice, information, or documentation is required by this AGREEMENT to be given to IYC, it shall be provided in writing by certified mail, return receipt requested, acknowledging delivery to the following:

Peter Halmos
President
IYC
c/o Gail Meyers, C.P.A.
Meyers & Associates
5715 Corporate Way
West Palm Beach, Florida 33407

and

13                    Initials: IYC _____; NOAA _____

Thomas A. Campbell
Pillsbury, Winthrop, Shaw, Pittman LLP
909 Fannin St., Suite 2000
Houston, Texas 77010

17.   **Miscellaneous**

17.1   This AGREEMENT may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. A faxed or emailed copy of this AGREEMENT shall have the same effect as an original.

17.2   All of the definitions, provisions, terms and language herein are contractual. There are no non-binding recitals.

17.3   All of the terms and conditions contained in this AGREEMENT shall be binding upon and inure to the benefit of the PARTIES, subject to the provisions of Paragraph 4.5 above, and comprehensively without limitation their respective directors, officers, partners, employees, direct or indirect parents and affiliates, shareholders, heirs, subsidiaries, predecessors, successors, and assigns and others such that the PARTIES' rights to receive the benefit of their bargain is not or cannot be compromised to the maximum extent not prohibited by law.

17.4   Should it ever be asserted by ACE-INA that any provision of this AGREEMENT is in conflict with, or in any way operates to void or impair any rights and/or benefits pursuant to applicable ACE-INA insurance contracts, such provision, and this AGREEMENT as a whole, shall be interpreted by a court of competent jurisdiction so as to be in accordance with and protect the rights, benefits and enforceability of such ACE-INA insurance contracts.

17.5   NOAA recognizes IYC's efforts to obtain the best environmentally sensitive recovery method to perform the recovery/removal/salvage of the S/Y *Legacy* possible.

18.   **No Additional Beneficiaries**

Nothing in this AGREEMENT, express or implied, confers, is intended to confer, or can be construed to confer, directly or indirectly, on any Non-Party (as defined in Paragraphs 1.11 and 4.5 of this AGREEMENT), any rights, remedies, releases, claims, benefits, interest, standing, obligations or liabilities of any nature or kind whatsoever under or by reason of this AGREEMENT.

19.   **Representations regarding Execution and Authority**

Each person executing this AGREEMENT expressly represents that such person is duly authorized to execute and cause the performance of this AGREEMENT and each such person or entity expressly waives any defense it now has, or in the future may have, with respect to the valid and binding execution of this AGREEMENT by an authorized representative. IYC has

14                Initials: IYC _____ ; NOAA _____

provided a copy of a corporate resolution from International Yachting Charters, Inc., authorizing Peter Halmos, in his capacity as president thereof, to sign this AGREEMENT on its behalf, and the signature of Peter Halmos hereon on behalf of International Yachting Charters, Inc. is binding on International Yachting Charters, Inc. Each PARTY is expressly authorized and permitted to rely on each other PARTY that its execution of this AGREEMENT is duly, irrevocably, and without restriction authorized.

EXECUTED this __5__ day of January, 2007.

15          Initials: IYC ____; NOAA ____

NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION

By: _____

Title: _____

STATE OF FLORIDA

By: _____

Title: _____

INTERNATIONAL YACHTING CHARTERS, INC.

By: _____

Title: _____

S/Y Legacy (In rem)

By: _____

Title: _____

16

Initials: IYC _____; NOAA _____

## RESOLUTION OF THE BOARD OF DIRECTORS OF
## INTERNATIONAL YACHTING CHARTERS, INC.

On ____January 5,_____, 2007, at a Special Meeting of the Board of Directors of International Yachting Charters, Inc., upon Motion duly made, seconded and carried, it was:

RESOLVED that the foregoing Agreement and Mutual Release between IYC (of which International Yachting Charters, Inc. is a defined member), NOAA and the State of FLORIDA, is approved on behalf of International Yachting Charters, Inc.; and

RESOLVED that Peter Halmos, as president of International Yachting Charters, Inc., is hereby authorized to sign and execute the foregoing Agreement and Mutual Release on behalf of International Yachting Charters, Inc., and to thereby bind International Yachting Charters, Inc. to its terms and conditions.

Dated:        ____January 5,_____, 2007

_____
President

_____
Secretary

17          Initials: IYC _____ ; NOAA _____