**CASE NO.: 4:22-10006-CIV-MARTINEZ/BECERRA**

PETER HALMOS, INTERNATIONAL
YACHTING CHARTER SERVICES, and
HIGH PLAINS CAPITAL CORPORATION,

      Plaintiffs,

vs.

UNITED STATES OF AMERICA,

      Defendant.

_____/

## AMENDED COMPLAINT

Peter Halmos, International Yachting Charter Services, and High Plains Capital Corporation file this Amended Complaint against the United States of America, and in support state:

## INTRODUCTION

1. In the early morning hours of October 24, 2005, Hurricane Wilma struck the Florida Keys with a never-before recorded fury. When the storm struck, Peter Halmos found himself aboard his sailing yacht, *S/Y Legacy* - a 158-foot Perini Navy Ketch designed and built for circumnavigation – along with her captain and full crew. A careful man, Halmos took care to ensure that *Legacy* and her crew would safely ride out the storm. Despite his best efforts, however, *Legacy* suffered catastrophic damage.

2. Halmos recalls waking up when *Legacy* suddenly lurched. He got up to inspect. As Halmos climbed towards the top deck, *Legacy* shook throwing him off balance. Halmos tumbled down the stairs. When he finally made it topside, Halmos initially thought that *Legacy*

had broken free of her anchors.  *Legacy's* captain and crew tried to reattach her anchors within the main Key West channel, only to discovery that the anchors had separated in two because of latent manufacturer defects.  Calls to the Coast Guard yielded little more than a promise to notify the crew's next of kin.  Fear swept over *Legacy's* crew.  Hurricane Wilma's powerful winds ripped off *Legacy's* twin masts.  Tens of thousands of pounds of aluminum crashed onto the vessel's wheelhouse and hull.  Seawater invaded the ship, coming through the damaged air vents and into her galley.  The crew rushed to stuff bed linens into the vents but could not completely stop the water intrusion.  Sparks flew as sea water fried *Legacy's* electronics.  *Legacy's* captain shut down all power to the vessel and called his wife to say goodbye.  Halmos and his crew gathered in *Legacy's* salon holding hands in the dark.

3.   Being sucked into the Gulf at about 10 knots and with no ability to control *Legacy,* Halmos and his crew were at the mercy of Mother Nature.  They had one hope – to run aground before being swept into Hurricane Wilma's eye. After what seemed like an eternity, that is exactly what happened.  *Legacy's* hull remained intact, and the crew's lives were spared.

4.   Halmos, however, would soon find himself in the middle of another equally uncontrolled and fiercely dangerous storm.  This time he would not be fighting against Mother Nature.  Instead, a veritable alphabet soup of predatory government agencies targeted Halmos.  Although Halmos and his crew were lucky to run aground, they could not have landed in a worse spot.  After Hurricane Wilma battered her for hours, *Legacy* eventually came to rest within the government-controlled Great White Heron National Wildlife Refuge which lies within the Florida Keys National Marine Sanctuary.  This is a protected area spanning thousands of acres between the Dry Tortugas in the Florida Keys and Miami's Biscayne Bay.

5.   Led by the National Oceanic and Atmospheric Administration ("NOAA"), the federal

government, aided by its agents in the State of Florida, would not let Halmos rescue *Legacy* without going through a legally complex and protracted permitting process that required Halmos to forfeit important rights. For more than a year, Halmos fought to get the necessary permits. Permits in hand, he then struggled to find a salvor who could do the work. All the while, NOAA hovered over Halmos, threatening investigations, administrative actions, and fines in the tens of millions of dollars.

6. For two years, the government continued to victimize Halmos, but he would not back down. Eventually, NOAA came to its senses, although not before inflicting considerable damage upon Halmos and *Legacy*. In 2007, Halmos and his related entities entered into separate written agreements with NOAA that would bind the United States as well as the State of Florida.

7. Both agreements are notable for the broad language used and agreed to by NOAA and its agent and partner, the State of Florida. The Agreements resolved all claims among and between Halmos and his related entities on the one side and NOAA and its agent and partner, the State of Florida, on the other. Through these Agreements, all involved agreed that they were **"FOREVER BUYING THEIR PEACE."** But the Agreements went well beyond a standard settlement agreement. To resolve the claims by Halmos and his related entities because of the government's wrongdoing, NOAA and the State of Florida agreed to several significant undertakings.

8. NOAA and the State of Florida promised not sue Halmos or his companies for any claims relating to or arising from any purported damage to the Sanctuary caused by *Legacy* during and after Hurricane Wilma. They agreed not to encourage any others to sue or otherwise interfere with Halmos and his companies in similar matters. More importantly, NOAA and the State of Florida agreed that they would help Halmos and his companies should they be sued or wish to sue in connection with any matters directly or indirectly arising from or relating to the subject matter

of the Agreements. Likewise, the government agreed not to aid any others directly or indirectly in actions against Halmos and/or IYC. These promises were at the heart of the settlement agreements at issue here.

9. Despite these promises, Halmos continued to be victimized with no hope of peace. For more than a decade, Halmos has endured a number of investigations by regulatory and law enforcement agencies; he has been sued by private parties in matters relating directly to the damage suffered by *Legacy* during Hurricane Wilma; and he has even come close to death on several occasions, most recently having suffered a traumatic brain injury as he looked for a new home for *Legacy* after it was evicted from its temporary dock in Key West, Florida. Throughout these years, NOAA and its agent and partner, the State of Florida, have not only failed to honor the terms of the 2007 Agreements, but they have also continued to victimize Halmos and his related entities by denying the aid and support promised under the Agreements.

10. This lawsuit now seeks enforcement of the 2007 agreements between Halmos, IYC, and NOAA (including its agent and partner, the State of Florida).

**THE PARTIES**

11. Plaintiff Peter Halmos is a resident of Palm Beach County, Florida.

12. Plaintiff International Yachting Charter Services owns the *S/Y Legacy*, a 158-foot sailboat. In 2005, *Legacy* suffered catastrophic damage as Hurricane Wilma battered the Florida Keys.

13. Plaintiff High Plains Capital Corporation is the registered owner of *M/V Mongoose*, a 46-foot power boat that serves as a tender for *S/Y Legacy*.

14. Defendant United States of America is the federal government, who is the proper

defendant pursuant to claims arising out of the Suits in Admiralty Act, 46 U.S.C. § 30901, *et seq*. At all relevant times, Defendant acted through its agent and partner, the State of Florida, and its agencies including, the Florida Department of Environmental Protection, and the Florida Fish and Wildlife Conservation Commission.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter and the parties pursuant to Article III, Section 2 of the Constitution because the judicial power in law and equity extends to controversies to which the United States is a party. Jurisdiction is also appropriate under 28 U.S.C. § 1331 because this case arises under the laws of the United States. This Court also has jurisdiction pursuant to 46 U.S.C. § 30903 because this action arises from a maritime dispute.

16. This Court also has also supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same claim or controversy under Article III of the United States Constitution.

17. Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1)(B) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred and a substantial part of the property at issue in this action is situated. Venue is also appropriate in this Court because the parties contractually agreed that all disputes would be resolved before a United States District Court sitting in the Southern District of Florida.

## GENERAL ALLEGATIONS

### *Hurricane Wilma Slams into the Florida Keys*

18. As of 11:00 p.m., Friday, October 21, 2005, "extremely dangerous Hurricane Wilma" was located along the Yucatan Peninsula 325 nautical miles southwest of Key West, Florida.

19. The storm remained in that general vicinity until approximately 5:00 a.m., Sunday, October 23, 2005, at which point Hurricane Wilma began moving east toward the Gulf of Mexico and Florida at an accelerating speed.

20. A mere twelve hours later, NOAA located Hurricane Wilma 210 miles from Key West with accelerating forward speed, and seas of 15 to 25 feet.

21. At the same time, NOAA reported Tropical Storm Alpha near the eastern end of Cuba moving north-northwest toward Miami, Florida at about 15 miles per hour, with 12-foot seas.

22. Six hours later, at 11:00 a.m., Sunday, October 23, 2005, NOAA located Hurricane Wilma 120 miles from Key West with a forward speed of about 20 miles per hour and seas of 15 to 25 feet.

23. At the same time, NOAA reported that Tropical Storm Alpha's forward speed toward Miami had increased to about 18 miles per hour resulting in winds of approximately 50 miles per hour and seas of 12 to 15 feet.

24. NOAA predicted that Tropical Storm Alpha would collide and be "absorbed" by Hurricane Wilma in the vicinity of Florida.

25. By 5:00 a.m., Monday, October 24, NOAA located Hurricane Wilma's eye just 65 miles north-northwest of Key West with a forward speed of 20 miles per hour.

26. Hurricane Wilma would strike the Florida Keys causing millions of dollars in damage. In its assessment of Wilma's impact in the Florida Keys, the National Weather Service noted that insurance payments made in Monroe County, Florida following the storm totaled $208,810,412.00.[1]

### *The S/Y Legacy Suffers Catastrophic Damage During Hurricane Wilma*

---

[1]      *Id.*

27. *S/Y Legacy* is a 158' foot sailing yacht with a maximum design speed of 13.5 knots in ideal weather conditions. The *Legacy's* design cruising speed under these same ideal conditions is approximately 10 knots.

28. As Hurricane Wilma approached the Florida Keys on October 24, 2005, *Legacy's* crew had already taken all reasonable and necessary precautions to safely ride out the storm, including taking on 10,000 gallons of fuel. *Legacy* was anchored in a location approved by the United States Coast Guard.

29. When NOAA reported Hurricane Wilma was "extremely dangerous," *Legacy* and her crew had three options: (1) head offshore in the hopes of avoiding the hurricane or ride it out at sea; (2) tie up to a dock and evacuate the vessel; or (3) anchor the vessel in an appropriate "hurricane hole."

30. As conditions deteriorated, it became clear to *Legacy's* master and crew that the vessel would not be able to outrun Wilma. The storm was approaching faster than *Legacy* could travel given the conditions at sea at the time. If she fled north, *Legacy* would have been trapped in the Gulf of Mexico. To the south, *Legacy* would have encountered Tropical Storm Alpha which was developing as Wilma approached.

31. *Legacy* also could not safely dock. Most commercial docks are not designed for a sailing vessel of *Legacy's* shape. Even if a dock had been available, the storm surge could have resulted in significant damage to *Legacy* and its fuel tanks, as well as the dock itself. Moreover, the danger posed by Wilma would have required *Legacy's* crew to evacuate. Changing wind conditions and tidal surges, however, required that the vessel be constantly adjusted by its crew.

32. Given these conditions, *Legacy's* crew guided the vessel to a "hurricane hole" near

marker 15 in the main northwest navigation channel connecting the Atlantic Ocean and Gulf of Mexico. This location was deep enough to allow *Legacy* to rotate 360 degrees into the wind, while the tidal flats, barrier reefs, and islands minimized the wave hikes from the wind and storm surge. This location also minimized the risk of collision with other vessels that might break free of their moorings.

33. To secure *Legacy*, its crew put out four hundred feet of heavy chains for each of its two main anchors. A third anchor with six hundred feet of heavy chain was deployed between the main anchors.

34. Latent defects, however, caused the anchors to separate in the early morning hours of October 25, 2005. The anchors came apart, setting *Legacy* adrift.

35. At first, *Legacy's* crew thought that the anchors had simply come loose. The crew struggled for several hours to anchor *Legacy*, not realizing that the anchors had come apart. The top part of the anchors remained attached to the line, while the bottom portion was in the sand.

36. At around 3:15 a.m. on October 25, *Legacy's* crew still had control of the vessel, although they could not anchor her. Suddenly, the vessel shuddered, as if rocked by a massive explosion. The force of Hurricane Wilma's winds had ripped *Legacy's* center mast from its base, sending thousands of pounds of aluminum onto the vessel's wheelhouse. The main mast came to rest on *Legacy's* port side, partially submerged.

37. The drag caused from the mast and the remaining portion of the anchor helped slow *Legacy* down keeping her and the crew from being sucked into Hurricane Wilma's eye.

38. Nevertheless, *Legacy* and her crew were in a battle to survive. The vessel pitched

violently in 25-foot waves. Water got inside *Legacy* igniting two separate fires. The crew was forced to shut down *Legacy's* engines and electronics. The vessel was dead in the water, her crew at the mercy of the storm.

39. *Legacy's* crew contacted the U.S. Coast Guard for assistance. Unable to come to *Legacy's* aid, the Coast Guard offered to contact the crew's next of kin.

40. As the sun rose, the waters calmed. Halmos and a crew member wondered whether they had survived the storm or were getting their first taste of the afterlife. After further investigation, Halmos realized that *Legacy* had run aground.

### *S/Y Legacy is Forced into the Florida Keys National Marine Sanctuary*

41. Hurricane Wilma forced *Legacy* from her anchorage and into the Great White Heron National Wildlife Refuge, which is contained within the Florida Keys National Marine Sanctuary ("the Sanctuary").

42. The Sanctuary "is one 15 marine protected areas that make up the National Marine Sanctuary System."[2] It protects 3,800 square miles of water surrounding the Florida Keys.[3] According to NOAA's website, "once you set foot in Keys waters, you have entered the sanctuary."[4]

43. The Sanctuary is a creature of and is administered under federal law.[5] However, because sixty percent of the protected area falls within Florida state waters, the Sanctuary "is also effective in these state waters under consent of the State of Florida."[6]

44. Working under a co-trustee agreement, NOAA and the State of Florida jointly manage

---

[2]     https://floridakeys.noaa.gov/about/welcome.html?s=about (last visited October 13, 2021).
[3]     *Id*.
[4]     *Id.*
[5]     https://floridakeys.noaa.gov/legislation.html?s=about (last visited October 13, 2021).
[6]     *Id*.

the Sanctuary.[7]  NOAA's primary management partners are the Florida Department of Environmental Protection, the Florida Fish and Wildlife Conservation Commission, and NOAA's Office of Law Enforcement.[8]

45.     In the years following Hurricane Wilma, Halmos and the plaintiff corporate entities named herein have found themselves embroiled in a seemingly never-ending string of investigations, government enforcement actions, and later civil and criminal actions arising from the *S/Y Legacy's* unintentional grounding in the Sanctuary during Hurricane Wilma.

### The NOAA Agreements

46. Nearly two years after Hurricane Wilma struck, Halmos and his affiliates and corporate entities, as further defined below, resolved their ongoing dispute with the United States and the State of Florida.

47. The parties entered into two separate written agreements on January 5, 2007.  One agreement resolved any claims between Halmos and the United States and the State of Florida, while the other agreement addressed claims between one of Halmos' corporate entities and the governmental parties.  *See* Composite Exhibit "A".

48. In one agreement, "Peter Halmos and Affiliates" contracted with NOAA and the State of Florida.  *See* Halmos/NOAA Agreement at Composite Exhibit "A".  The parties were defined broadly:

> PETER HALMOS and his immediate family members individually, including but not limited to PETER HALMOS and all of their direct or indirect corporations and affiliates, trusts and tangible and/or intangible interests; and all shareholders, employees, agents, partners, partnerships, representatives, subsidiaries, trusts, affiliates, heirs, and assigns of any of the foregoing including but limited to any alleged capacity as an operator of *S/Y Legacy*.  This does not

---

[7]     *Id.*
[8]     *Id.*

> include Peter Halmos in his capacity as a owner, shareholder, director, officer, employee, agent, partner or representative of IYC.

*See* Halmos/NOAA Agreement at Exhibit "A" at ¶1.3. The Agreement further defined NOAA as "acting in all of its capacities, including but not limited to that of Natural Resources Trustee and Sanctuary manager for the SANCTUARY." *Id.* at ¶1.4.

49. Halmos' company, International Yachting Charters, Inc. ("IYC"), entered a substantially similar agreement with NOAA and the State of Florida. *See* IYC/NOAA Agreement at Composite Exhibit "A". In this second agreement, IYC was defined to mean and include

> *S/Y Legacy* and her tenders (*in rem*), including its owner, all officers and crew of *S/Y Legacy*; and all shareholders, directors, officers, employees, agents, partners, partnerships, representatives, subsidiaries, trusts, affiliates, successors and assigns of any of the foregoing including but not limited to any alleged capacity as an operator of *S/Y Legacy*. This does not include Peter Halmos in his non-corporate individual capacity.

*See* IYC/NOAA Agreement at Composite Exhibit "A" at ¶1.3. NOAA and the State of Florida were defined as in the first agreement. *See* IYC/NOAA Agreement at Composite Exhibit "A" at ¶¶1.4-1.5.

50. The NOAA Agreements further defined the term "Parties" or "Party" to include Peter Halmos and his Affiliates and IYC on the one hand and NOAA and the State of Florida on the other. *See* Halmos/NOAA Agreement at Exhibit "A" at ¶1.6; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶¶1.6.

51. The intent of the Halmos and IYC parties on the one hand and the NOAA and the State of Florida parties on the other hand was clear – (1) to resolve all disputes between the parties relating to and arising from the subject matter of the Agreements*;* (2) to preclude NOAA and Florida from aiding any non-parties to the NOAA Agreements in any legal actions relating to or arising from the subject matter of the Agreements; and (3) to require NOAA and Florida to come

to Halmos and his Affiliates and/or IYC's aid should they be sued or wish to sue in connection with the subject matter of the Agreements.

52. To that end, the NOAA Agreements contain explicit language fully, finally, and forever resolving the parties' dispute:

### 3.  Mutual Stipulations

The PARTIES hereby stipulate:

That all PARTIES desire and intend hereby to avoid the further expense, inconvenience, and uncertainty of protracted litigation, and to settle all disputes, controversies and CLAIMS, whether asserted or unasserted, by and between the PARTIES, directly or indirectly arising from, referring to and/or concerning the Subject Matter of this AGREEMENT in the manner and upon the terms and conditions set forth in this AGREEMENT so as to irrevocably, finally and without further recourse settle, release or assign, compromise, and discharge fully all CLAIMS of all PARTIES against the other PARTIES, and by which the PARTIES are forever buying their peace.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶ 3.5; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶3.6.

67. Critically, NOAA and the State of Florida concluded that Halmos and IYC were "not guilty of any unreasonable omission, to prevent the grounding of *S/Y Legacy* before and during the onslaught of Hurricane Wilma, and to minimize any alleged damage to the SANCUTARY and all natural resources as a result thereof and thereafter." *See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶ 2.13; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶2.13.

68. The Agreements further provided that should any party breach their Agreement, the protections further detailed below would be lost and would expose the breaching party to significant potential liability:

> Should any PARTY breach this AGREEMENT by directly or indirectly asserting any CLAIM released or assigned by that PARTY herein against any other PARTY, and/or in any way instituting indirectly what is prohibited by this AGREEMENT from being done directly, then the release or assignment provided by the PARTY against whom such a CLAIM is asserted or in any manner enforced shall become null and void and of no benefit to the PARTY asserting such CLAIM. The release or assignment of the PARTY wrongfully so doing shall remain valid and in full force and effect and may be asserted as a defense to such CLAIM by the PARTY against whom the wrongful CLAIM is brought. In such event, the breaching PARTY shall be liable for damages, injuries, costs and expenses, including reasonable attorneys, experts, researchers, consultants, investigators, and advisors fees, through all available appeal, to the non-breaching party to be determined in a lawful tribunal by a constitutionally constituted jury applying a "preponderance of the evidence" standard of proof.

See Halmos/NOAA Agreement at Composite Exhibit "A" at ¶ 4.8; see also IYC/NOAA

Agreement at Composite Exhibit "A" at ¶4.9.

69.  As part of the agreements, NOAA and the State of Florida agreed to very broad

covenants not to sue either Halmos or IYC:

### 5.  Covenant Not to Sue

> **5.1**  …The GOVERNMENTAL ENTITIES further unconditionally, fully, irrevocably and finally agree and covenant forever not to directly or indirectly cause, instigate and/or encourage any other person or entity to engage in such above-referenced conduct including to file, prosecute, commence, institute or continue any administrative enforcement actions, complaint, suit, legal or equitable  proceeding, including proceedings before any federal, state or foreign judicial, regulatory or arbitral tribunal or other forum, wherever located, or prosecute against PETER HALMOS AND AFFILIATES, any matter of any and every kind and nature whatsoever, whether known or unknown, and whensoever or however occurring, arising directly or indirectly from or having any direct or indirect  connection with the Subject Matter of this AGREEMENT.

See Halmos/NOAA Agreement at Composite Exhibit "A" at ¶5.1; see also IYC/NOAA Agreement

at Composite Exhibit "A" at ¶5.1.

70. In addition to the broad covenants not to sue, NOAA and the State of Florida agreed to help Halmos and IYC should they be sued or should they sue in connection with the subject matter of the Agreements:

## 6. Cooperation

6.1     Should any Non-Party at any time assert any claim or bring any action against of the PARTIES herein and/or should any of the PARTIES assert any claim or bring any action against a Non-Party directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, the other PARTIES shall cooperate with the PARTY against or by whom such a claim is asserted or action brought to the maximum extent not expressly prohibited by law, to defend against such claim or action and to seek any and all lawful redress against any Non-Party that is not expressly prohibited by law.  NOAA and PETER HALMOS will cooperate in all respects to effectuate the purposes and performance specified in this Agreement.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶6.1; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶6.1.

71.  To give more "teeth" to their agreement, NOAA and the State of Florida further agreed not to aid, directly or indirectly, any other person or entity in litigation against Halmos or IYC:

6.2.    The GOVERNMENTAL ENTITIES agree not to, directly or indirectly through one or more intermediaries, intentionally provide any compensation, benefits, material non-public information concerning PETER HALMOS AND AFFILIATES, assistance and/or cooperation to any Non-Party who at any time now and/or in the future asserts any allegation, claim and/or adverse conduct against or toward PETER HALMOS AND AFFILIATES, and/or against whom PETER HALMOS AND AFFILIATES asserts any claim and/or allegations, directly or indirectly arising from, relating to and/or concerning the Subject Matter of this AGREEMENT, in any threatened, pending or future event, course of conduct and/or proceeding of every nature  or kind, except to the extent required by law or legal process; and in such instance only after ten (10) days advance written notice to PETER HALMOS AND AFFILIATES of such proposed action (unless a shorter period is ordered by a lawful tribunal) and only after that GOVERNMENTAL ENTITY'S counsel has concluded that such action is required by law and the

requested information and/or other legal process is disclosed to PETER HALMOS AND AFFILIATES at such time and manner whereby PETER HALMOS AND AFFILIATES'S due process rights are fully protected. The GOVERNMENTAL ENTITIES further agree that they will not directly or indirectly contact or encourage any taxing, enforcement or regulatory agencies and personnel to investigate, audit, take administrative action against, sue, or otherwise assert any claim and/or action against PETER HALMOS AND AFFILIATES.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶6.2; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶6.2.

72. As part of their broad agreement, the parties agreed that the failure, by either side, to strictly perform the terms of the NOAA agreement, would lead to irreparable harm. To address this issue, the parties further agreed to injunctive relief in the form of specific performance of the NOAA Agreements:

**Specific Performance**

The PARTIES acknowledge and agree that each would be irreparably damaged in the event that any of the provisions of this AGREEMENT are not fully and strictly performed in accordance with their specific terms or are otherwise breached. It is accordingly hereby agreed that each PARTY shall be entitled to seek an injunction (or injunctions) to prevent breaches of this AGREEMENT by any other PARTY hereto and to specifically enforce this AGREEMENT and the terms and provisions thereof against any other PARTY hereto. The selection of Specific Performance as a requested remedy in no way waives any rights to any other remedy that may be available to that PARTY at law or in equity or otherwise.

*See* Halmos/NOAA Agreement at Composite Exhibit "A" at ¶13; *see also* IYC/NOAA Agreement at Composite Exhibit "A" at ¶14.

73. While both agreements are similar in many respects, they are not identical. Among other differences, the Agreement with Halmos specifically released him from any liability for governmental claims or alleged damages or injuries "that could have been asserted or may now be

and in the future be asserted arising from , relating to and/or concerning the Subject Matter of this

Agreement." *See* Halmos/NOAA Agreement at Exhibit "A" at ¶7.8.

### *Plaintiff Halmos is Charged Criminally and is also Sued in Civil Actions Along with His Corporate Entities in Monroe County, Florida*

74. Even though Halmos and IYC fully intended to buy peace forever through the

agreements with NOAA and the State of Florida, the opposite has happened. Instead of peace,

Halmos and his related entities have remained embroiled in an ongoing series of investigations,

regulatory actions, civil litigation, and criminal prosecutions through NOAA's agent and partner,

the State of Florida. Those actions, as further alleged below, involve the subject matter of the

NOAA Agreements.

75. Halmos has personally been subjected to criminal investigations and prosecutions

relating entirely to *Legacy* in Monroe County, Florida. These cases ranged from misdemeanors to

infractions directly relating to Halmos' efforts to relocate *Legacy* from Key West, Florida.

76. In one instance, Halmos was detained, while on the water, by Florida law enforcement

officers and searched. This invasive procedure arose out of a claim that Halmos could not produce

a registration for his vessel. This conduct not only exceeded the scope of a permissible search and

seizure on the water but was the type of invasive and intrusive government conduct that Halmos

sought to avoid in negotiation the NOAA Agreements. While he did not seek a complete release

from the application of Florida and federal laws, he did seek a release from the ongoing and

persistent harassment he suffered prior to entering into the NOAA Agreements. The government's

conduct in this instance violated the Agreements.

77. Additionally, Halmos has been charged in several misdemeanor cases, all of which

involved the subject matter of the NOAA Agreements. For example, in *State of Florida v. Peter

Halmos*, Case Number 19-MM-001343, the State of Florida charged Mr. Halmos with three counts

of reckless operations of a vessel, in violation of section 327.33, Florida Statutes. This is a first-degree misdemeanor that was consolidated with additional infractions under case number 19-IN-003667-A-K and 19-IN-003668-A-K. These charges arose out of Halmos' efforts to remove *Legacy* from Key West, Florida.

72. The criminal misdemeanor and infraction cases were ultimately dismissed after Mr. Halmos negotiated a resolution with the Monroe County State Attorney's Office. Rather than benefit from the assistance, cooperation, and support specifically negotiated pursuant to the NOAA Agreements, Halmos had to endure the stress, cost, and anxiety of being a defendant in a criminal case.

73. Halmos should not have been investigated, charged, or prosecuted for offenses that involved *Legacy*, the subject matter of the NOAA Agreements. Each of the criminal charges filed the State of Florida arose from conduct that the United States essentially immunized Halmos from as part of the NOAA Agreements. More specifically, these actions by Monroe County prosecutors, arising out of the movement of *Legacy,* violated the express terms of sections 5.1, 6.1, and 6.2 of the NOAA Agreements.

74. Further, Halmos and his related corporate entities have also been involved in a number of civil suits in Monroe County, Florida involving *Legacy* and arising out of the subject matter of the NOAA Agreements. In a battery of cases including, but not limited to, *3D of Key West, Inc. v. Peter Halmos, et al.*, Case Number 21-CC-346-K, *Longstock II, LLC v. Peter Halmos, et al.*, Case Number 18-CA-000943-K, *Longstock II, LLC v. Peter Halmos, et al.*, Case Number 18-CC-000108-K, and *Longstock II, LLC v. Peter Halmos*, Case Number 19-CA-000515-K, seeking eviction, declaratory and injunctive relief, and damages.

75. Each of these civil claims related specifically to the subject matter of the NOAA

Agreements and arose from Halmos' efforts to repair and later remove *Legacy* Key West, Florida. These cases were filed after the NOAA Agreements were negotiated while Halmos was attempting to rehabilitate *Legacy.* The plaintiffs in each of these litigants pursued a strategy designed to evict *Legacy*, to seize *Legacy* as part of a failed self-help scheme, and to deny Halmos the benefit of the bargain he had struck with the government. When Halmos, exasperated by the continued harassment sought to remove *Legacy*, the civil plaintiffs sought damages for alleged damages caused by Halmos and his related entities while trying to relocate *Legacy*.

76. As with the criminal cases referenced above, Mr. Halmos and his related entities should not have been required to litigate these cases which were filed nearly a decade after Halmos had resolved all issues relating to *Legacy* with the United States. These civil lawsuits constituted a violation of the express terms contained in sections 5.1, 6.1, and 6.2 of the NOAA Agreements. Not only did the government fail to prevent the continuation of the harassment directed at Halmos, but it also failed to take steps to stop the harassment and support Halmos as these investigations, criminal prosecutions, and criminal actions continued.

77. The Government should have immunized Halmos from any potential criminal activity arising out of the NOAA Agreements. The Agreements were designed to buy Halmos "peace" with respect to *Legacy* and any actions related to the vessel's transfer from Key West, Florida should not have become the subject of further investigation or prosecution. Likewise, the Government should have indemnified Halmos in connection with any civil actions arising out of and related to *Legacy*.

78. At least one Florida judge agreed that Halmos' NOAA Agreements had a pre-emptive effect. The handwritten order, attached as exhibit "B," clearly states that in the context of the ordinance violations charged, those matters were pre-empted by the NOAA Agreements.

*Plaintiff Halmos Suffers a Traumatic Brain Injury*

79. In addition to the costs in time and treasure that these actions have had on Halmos and his related entities, Halmos himself has also suffered severe physical injury.  On March 25, 2021, while visiting a private home, Halmos fell and struck his head.  Halmos, who had never visited the home before, did not see a step leading into a sunken room.  The fall caused Halmos, who is nearly eighty years old, to lose consciousness and left him concussed.  But for the fact that Halmos was searching for a new location to dock *Legacy* following its eviction from its dock in Key West, Florida, Halmos would not have been visiting the property on March 25th.

80. Halmos' treating physician determined that Halmos suffered a traumatic brain injury because of the fall.  His symptoms include acute post-traumatic headaches, sleep disturbances, nausea, imbalance, scleredema, and various cognitive issues.  Additionally, Halmos has "difficulty concentrating, remembering, speaking, and reading."  According to Halmos' treating physician, stress exacerbates these symptoms.

81. The physical injury suffered by Halmos is the culmination of the damages he has suffered as a result of the United States and its agent, the State of Florida's, reneging of their obligations pursuant to the NOAA Agreements.

## CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT

82. Plaintiffs re-allege paragraphs 1 through 81.

83. When Hurricane Wilma struck the Florida Keys in 2005, it wreaked havoc.  Among the storm's victims was *S/Y Legacy*, which was driven into the Great White Heron National Wildlife Refuge within the Florida National Marine Sanctuary, through no fault of its master and crew.

84. After the storm, Halmos and certain of his corporate entities were ensnared in a series of seemingly never-ending investigations, regulatory actions, civil lawsuits, and criminal prosecutions.

85. In 2007, Peter Halmos and his Affiliates and IYC entered separate written agreements with NOAA and the State of Florida.

86. Through the NOAA Agreements, the parties were "forever buying their peace."

87. As part of these peace agreements, NOAA and the State of Florida covenanted (1) not to sue Halmos and/or IYC; (2) not to directly or indirectly cause, instigate, or encourage another party to sue in connection with any matter related to or arising from the subject matter of the NOAA Agreements; (3) to cooperate and defend Halmos and IYC against any claim or action brought by a non-party relating to or arising from the subject matter of the NOAA Agreements; (4) to aid Halmos and IYC in any claims they may bring relating to or arising from the subject matter of the NOAA Agreements; and (5) to refrain from providing any form of aid or assistance to any non-party against Halmos and/or IYC in any matter relating to or arising from the subject matter of the NOAA Agreements.

88. The NOAA Agreements further provide that the parties' failure to specifically perform the terms of the agreements would result in irreparable harm for which there exists no adequate remedy at law.

89. To ensure that the parties would honor the terms of the NOAA Agreements, the contracts further provide for the remedy of specific performance where one party fails to strictly enforce the terms of the agreements.

90. Halmos, IYC, and certain other of Halmos' companies are currently the subject of

several civil lawsuits pending in the Circuit Court of Monroe County, Florida. The subject matter of both lawsuits relate to and arise from the subject matter of the NOAA Agreements. These are in addition to several investigations, ordinance violations, and misdemeanor cases that have targeted Halmos directly.

91. Under the broadly worded covenants included in the NOAA Agreements, NOAA, individually, and through its agent and partner, the State of Florida, are contractually bound to (1) cooperate with Halmos and IYC in their defense of these actions and (2) refrain from providing any form of aid or support to the non-parties bringing these actions.

92. Despite requests by both Halmos and IYC, neither NOAA, nor the State of Florida have taken any steps to perform as required under the NOAA Agreements.

93. NOAA and IYC's ongoing failure to strictly enforce the terms of the NOAA Agreements constitute a breach of contract which is damaging Halmos and IYC.

WHEREFORE, Plaintiffs Peter Halmos, International Yachting Charter Services, and High Plains Capital Corporation, respectfully request that this Court enter a judgment for breach of contract in favor of Peter Halmos and his Affiliates and IYC and against the United States of America, for prejudgment interest, reasonable attorneys' fees, costs, and such other and further relief as this Court deems just, equitable, and proper including, but not limited to, specific performance and injunctive relief.

### COUNT TWO
### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING

94. Plaintiffs re-allege paragraphs 1 through 81.

95. Peter Halmos and his Affiliates and IYC are parties to separate agreements with NOAA and the State of Florida.

96. Florida law and, specifically, the implied covenant of good faith and fair dealing, mandates that NOAA and its agent and partner, the State of Florida, act in good faith and deal with Halmos and his Affiliates and IYC in good faith.

97. NOAA and the State of Florida have consciously and deliberately failed to act in good faith. More specifically, NOAA, individually, and through its agent and partner, the State of Florida, have failed to honor, perform, and comply with their obligations as defined and set forth in sections three through six of the respective NOAA Agreements.

98. As a result of NOAA and the State of Florida's failure to honor the terms of the NOAA Agreements, Peter Halmos and IYC have been exposed to the inconvenience and costs of multiple investigations, regulatory actions, civil lawsuits, and criminal prosecutions in Monroe County, Florida.

99. NOAA and its agent and partner, the State of Florida's, failure to honor the terms of the NOAA Agreements have frustrated the contracts' purpose by denying Halmos the support and cooperation promised by the parties' Agreements and more fully defined in sections three through six of the NOAA Agreements. These breaches have also contravened the reasonable expectation of Halmos and his Affiliates and IYC which were set forth in the express provisions of the NOAA Agreements.

100. As a result of the foregoing, Halmos and his Affiliates and IYC have been damaged.

WHEREFORE, Plaintiffs Peter Halmos, International Yachting Charter Services, and High Plains Capital Corporation, respectfully request that this Court enter a judgment for breach of the implied covenant of good faith and fair dealing in favor of Peter Halmos and his Affiliates and IYC and against the United States of America, plus prejudgment interest, reasonable attorneys'

fees, costs, and such other and further relief as this Court deems just, equitable, and proper including, but not limited to, specific performance and injunctive relief.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs demand a trial by jury on all matters so triable.

Respectfully submitted:

**CARLOS F. GONZALEZ, P.A.**
2332 Galiano Street
Second Floor
Coral Gables, Florida 33134
Tel. 786.410.7662
Email: cfg@carlosfgonzalez.com

By: _/s/ Carlos F. Gonzalez_
Carlos F. Gonzalez
Florida Bar No. 494631

*Counsel for Peter Halmos,*
*International Yachting Charter*
*Services, and High Plains Capital*
*Corporation*

-And-

Guy A. Lewis
Florida Bar No. 623740
The Law Offices of Guy A. Lewis
12575 Southwest 67th Avenue
Pinecrest, Florida 33156
Email: lewis@lewistein.com

*Counsel for Peter Halmos*

## CERTIFICATE OF SERVICE

I certify that on May 10, 2023, I electronically served the foregoing document with the Clerk of the Court by using the CM/ECF system.

/s/     *Carlos F. Gonzalez*
Carlos F. Gonzalez